**Tristan P. EGOLF, et al., Plaintiffs,**

v.

**Christopher WITMER,
et al., Defendants.**

No. Civ.A. 04–5695.

United States District Court,
E.D. Pennsylvania.

March 9, 2006.

---

J. Dwight Yoder, Gibbel Kraybill & Hess, Lancaster, PA, Paula Kay Knidsen, Harrisburg, PA, for Plaintiffs.

Robert G. Hanna, Lavery, Faherty, Young & Patterson, P.C., Harrisburg, PA, Susan J. Forney, Office of Attorney General, Harrisburg, PA, for Defendants.

## *MEMORANDUM*

DIAMOND, District Judge.

In July, 2004, Plaintiffs—a small group of young men—protested against Presi-

dent Bush's visit to Lancaster County, Pennsylvania by stripping down to thong underwear and climbing onto each other's backs. Defendants—who are Pennsylvania State Troopers—arrested Plaintiffs and removed them from the public thoroughfare where they staged their protest. Plaintiffs now charge that Defendants violated their First and Fourth Amendment rights. I conclude that the Troopers did not violate the Constitution and, in any event, are entitled to qualified immunity. Accordingly, I grant the Troopers' Motion for Summary Judgment and deny Plaintiffs' Motion for Partial Summary Judgment.

## *LEGAL STANDARD*

Upon motion of any party, summary judgment is appropriate "if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party must initially show the absence of any genuine issues of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). An issue is material only if it could affect the result of the suit under governing law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In deciding whether to grant summary judgment, I "must view the facts in the light most favorable to the non-moving party" and take every reasonable inference in that party's favor. *Hugh v. Butler County Family YMCA,* 418 F.3d 265 (3d Cir.2005). If I then determine that the moving party is entitled to judgment as a matter of law, summary judgment is appropriate. *See Celotex,* 477 U.S. at 322, 106 S.Ct. 2548; *Wisniewski v. Johns–Manville Corp.,* 812 F.2d 81, 83 (3d Cir. 1987).

Because a motion for summary judgment looks beyond the pleadings, factual specificity is required of the party opposing the motion. *See Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548. To prevail, the opposing party may not simply restate the allegations made in its pleadings or merely rely upon "self-serving conclusions, unsupported by specific facts in the record." *Id.*

When qualified immunity is raised as a defense, its availability is "an objective question to be decided by the court as a matter of law." *Carswell v. Borough of Homestead,* 381 F.3d 235, 242 (3d Cir. 2004). Only "disputed historical facts material to the qualified immunity question" must go to the jury. *Id.* Thus, the standard I must apply is whether, "[t]aken in the light most favorable to the party asserting the injury, [ ]the facts alleged show the officer[s'] conduct violated a constitutional right." *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

## *BACKGROUND*

On July 9, 2004, President Bush was scheduled to make a campaign visit to East Lampeter Township in Lancaster County. *Pl. Mem. in Supp. of Part. S.J.* at 4–5. Outside the private, invitation-only event, Township Police provided security and crowd control and several Pennsylvania State Police Troopers assisted them. *Pl. S.J. Supp. Record* at SJ–96 (Hertzog Dep.); SJ–113 (Gerow Dep.); SJ–138–40 (Ely Dep.).

During the hours before the President arrived, a crowd gathered in an open area across nearby Route 340. *Pl. S.J. Record* at SJ–13–14, SJ–56 (Egolf Dep.); SJ–114–15 (Gerow Dep.). The gathering crowd included families with young children as well as people carrying signs protesting against the Bush Administration, against the war in Iraq, and against the Abu Ghraib prison. *Id.* at SJ–71 (Willard Dep.); SJ–64 (Keely Dep.). Bush Admin-

istration supporters were also present. *Id.* at SJ–71 (Willard Dep.), SJ–89 (Kohler Dep.).

With several others, the original Plaintiffs—Tristan P. Egolf, Adam Clayton Willard, Jonathan A. Kohler, David J.C. O'Bryant, and Benjamin D. Keely—selected a spot near Route 340 to stage a protest during the President's arrival. *Pl. S.J. Record* at SJ–64 (Egolf Dep.); SJ–70–71 (Willard Dep.). Standing at the front of the crowd, Plaintiffs (along with two others) stripped to thong underwear by removing their shirts and pants. *Id.* at SJ–2–3 (photos); SJ–54 (Egolf Dep.); SJ–88 (Kohler Dep.); SJ–118 (Gerow Dep.). Five men got on their hands and knees on the ground; two men climbed onto the backs of the five and also got on their hands and knees, baring their buttocks toward the road. *Docs in Supp. of Def. Mot.* at 28 (Jones Dep. at 35). Plaintiffs intended to form a structure that resembled a photograph taken at the Abu Ghraib prison in Iraq: three individuals perched on the backs of four individuals. Plaintiffs concede, however, that "[i]n their haste," they formed their "pyramid" incorrectly. *Pl. Mem.* at 7; *Pl. S.J. Record* at SJ–62–63 (Keely Dep.); SJ–77 (O'Bryant Dep.).

Plaintiffs coordinated their "pyramid" with Kara Dimitris (not a party here), arranging for her to stand behind the pyramid with a sign reading "Great War, George." *Id.* at SJ–57 (Egolf Dep.). In addition, Plaintiffs arranged for Dan Rhineer (another non-party), to videotape the protest and to explain Plaintiffs' actions to bystanders. *Id.* at SJ–228 (Rhineer Decl.). Through their behavior, Plaintiffs intended to communicate a message of protest against President Bush and the war in Iraq. *Id.* at SJ–55 (Egolf Dep.); SJ–86 (Kohler Dep.). The President did not pass the protest area until after the protest had concluded. *Id.* at SJ–130 (Redden Dep.); *Dec. 16, 2005, Tr.* at 23.

In planning their protest, Plaintiffs wanted to recreate nudity "as closely as possible." *Pl. Mem.* at 20. In fact, as Plaintiffs formed their pyramid, they looked naked from a distance except for the tops of their thongs. *See Jones Dep.* at 35. Moreover, the Rhineer videotape shows that the contours and movement of Plaintiffs' genitals were clearly visible through the flimsy, tight-fitting garments. *See Pl. S.J. Record* at Ex. 1. Indeed, Plaintiffs acknowledge that one protester's genitals became visible immediately after he was removed from the pyramid. *See id.; Dec. 16, 2005 Tr.* at 5–6.

When Plaintiffs began their protest, Defendant Trooper Hertzog was standing about twenty feet away. *Pl. S.J. Record* at SJ–100 (Hertzog Dep.). Defendant Troopers Gerow, Kline, and Adams stood east of Trooper Hertzog along the road. *Id.* at SJ–100 (Hertzog Dep.); SJ–115 (Gerow Dep.). Approximately one minute after the Plaintiffs stripped and formed the pyramid, Trooper Gerow began pulling the formation apart, and Troopers Kline, Hertzog, and Adams quickly joined her. *Pl. Mem.* at 9; *Pl. S.J. Record* at SJ–101–02 (Hertzog Dep.). The Troopers pulled Plaintiffs to the ground, placing them face-down with their hands cuffed behind the back. *Pl. S.J. Record* at SJ–55 (Egolf Dep.), SJ–65 (Keely Dep.); SJ–72 (Willard Dep.); SJ–90 (Kohler Dep.); SJ–118 (Gerow Dep.). Plaintiffs do not complain that the Troopers used unnecessary force in making the arrest. *Id.* at SJ–57 (Egolf Dep.).

The Troopers did not arrest one protester who "quickly dressed." *Pl. Mem.* at 11. Although the crowd included many other protesters who remained clothed—including Ms. Dimitris and Mr. Rhineer—only the five Plaintiffs (and a sixth member of

the pyramid, who is not a Plaintiff here) were arrested. *Id.* at SJ–82; *Jones Dep.* at 38; *Pl. Mem.* at 11.

Having taken Plaintiffs into custody, the Troopers moved them out of view. *Pl. S.J. Record* at SJ–105 (Hertzog Dep.); SJ–118 (Gerow Dep.). The Township Police transported Plaintiffs to the Township Police station where they were held for approximately two hours. *Pl. S.J. Record* at SJ–81 (O'Bryant Dep.); SJ–159–60 (Adams Dep.); SJ–144 (Ely Dep.). The Troopers returned to their earlier positions monitoring the crowd. *Id.* at SJ–118 (Gerow Dep.); SJ–159–60 (Adams Dep.).

Initially, Township Police cited Plaintiffs for disorderly conduct. *Pl. S.J. Record* at SJ–144–45 (Ely Dep.). The Lancaster County District Attorney withdrew these charges and declined to prosecute Plaintiffs. *Id.* at SJ–20–21.

On December 9, 2004, Plaintiffs instituted this suit against Troopers Gerow, Hertzog, and Kline as well as six named Township Police Officers, five unknown state actors (alleged to be municipal or state law enforcement officers or others), and five unknown federal actors (alleged to be United States Secret Service Agents or members of the "White House advance team"). *Pl. Compl.* (Doc. No. 1) at 2–3. Plaintiffs asserted claims under 42 U.S.C. § 1983 and the First, Fourth, and Fourteenth Amendments, alleging that Defendants acted at the direction of a Secret Service or White House employee to interrupt the protest. *Id.* at 5. Plaintiffs filed an Amended Complaint on February 17, 2005, dismissing three of the Township Police Officers. *Pl. Am. Compl.* (Doc. No. 2) at 2–3.

I granted Plaintiffs leave to file a Second Amended Complaint on April 25, 2005. *Order of Apr. 25, 2005* (Doc. No. 16). Plaintiffs withdrew all claims and allegations respecting unknown federal and state actors. *Pl. Second Amended Complaint* (Doc. No. 17) at 1–3. Plaintiffs also added Trooper Adams and the Township as defendants. *Id.* Significantly, with the filing of the Second Amended Complaint, Plaintiffs "do not suggest that the Troopers arrested Plaintiffs for expressing a particular political view (*i.e.* against President Bush or against the war in Iraq)." *Pl. Br. in Opp'n. to Def. Mot. for S.J.* at 14, n. 8.

On May 7, 2005, Tristan Egolf died, and on June 16, 2005, Defendants suggested his death on the record. *Pl. Mot. to Substitute Party* (Doc. No. 24) at 1. Pursuant to Plaintiffs' Motion, on June 28, 2005, I substituted Paula M. Egolf and Gary L. Egolf—Tristan's parents—as Plaintiffs in this action. *Order of June 29, 2005* (Doc. No. 25). On July 5, 2005, pursuant to the parties' stipulation, I dismissed the Township Police Officers and the Township. *Stipulation of Dismissal* (Doc. No. 26); *Order of July 5, 2005* (Doc. No. 28).

The four remaining defendants—Troopers Gerow, Hertzog, Kline, and Adams—moved for summary judgment on July 13, 2005. On the same day, Plaintiffs moved for partial summary judgment as to liability. Both sides agree that there are no material factual issues in dispute. *See Dec. 16, 2005 Tr.* at 2, 35.

### DISCUSSION

**I. The Troopers Did Not Violate Plaintiffs' Fourth Amendment Rights.**

Plaintiffs allege that their Fourth Amendment rights were violated when the Troopers arrested them "without probable cause." *Pl. Mem.* at 30. I disagree.

**A. The Troopers Acted With Probable Cause.**

■ Probable cause to arrest exists when "the facts and circumstances within

the arresting officer[s'] knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Estate of Smith v. Marasco,* 318 F.3d 497, 514 (3d Cir.2003). My probable cause inquiry "is an objective one; the arresting officer[s'] subjective beliefs about the existence of probable cause are not relevant." *Berg v. County of Allegheny,* 219 F.3d 261, 272 (3d Cir.2000). The officers' objectively reasonable belief must be that each element of the criminal offense has been satisfied. *See Wright v. City of Philadelphia,* 409 F.3d 595, 602 (3d Cir.2005); *Newsome v. Whitaker,* 2005 WL 525398, at *2, 2005 U.S. Dist. LEXIS 3446, *9–*11 (E.D.Pa. Mar. 7, 2005).

█ The Troopers contend that they had probable cause to arrest Plaintiffs for open lewdness. Pennsylvania's lewdness statute provides that "[a] person commits a misdemeanor of the third degree if he does any lewd act which he knows is likely to be observed by others who would be affronted or alarmed." 18 Pa.C.S. § 5901. The undisputed facts show that the Troopers had probable cause to believe Plaintiffs had violated this statute.

The video submitted by Plaintiffs shows that in plain view of the Troopers, Plaintiffs stripped to thong underwear and stacked themselves before a crowd containing numerous children. *See Pl. S.J. Record* at Ex. 1; SJ–2–3; (video and photographic record of the display); *Pl. Mem.* at 11; *Def. Mem. in Supp. of Mot. for S.J.* at 6. As Plaintiffs acknowledged at oral argument, the thin material of their tight-fitting thongs unmistakably displayed the contours and movement of their genitals. *Pl. S.J. Record* at Ex.1; *Dec. 16, 2005 Tr.* at 6. From the rear, the thongs displayed the entire surface of their buttocks; from various angles, Plaintiffs appeared to be entirely naked. *Pl. S.J. Record* at Ex. 1,

2. Indeed, Plaintiffs concede they designed their display to recreate nudity "as closely as possible." *Pl. Mem.* at 20. Plaintiffs also concede that the genitals of at least one of the protesters were exposed as Plaintiffs were arrested. *See Dec. 16, 2005 Tr.* at 5–6; *see also Pl. S.J. Record* at Ex. 1, 2. The video clearly shows toddlers playing a few yards away, and school-age children standing within feet of Plaintiffs. *Pl. S.J. Record* at Ex. 1. Thus, once Plaintiffs removed their clothing, a number of spectators became upset, noting that their children were present. *Id.*

Plaintiffs maintain that they did not break the law because they kept their genitals covered and did not engage in any sexual acts. *Pl. Br.* at 22. The parties concede, however, that the Pennsylvania courts have not yet addressed whether comparable exposure of the full buttocks and the contours and movement of the genitals is a "lewd act" under § 5901. In cases presenting such legal uncertainty, courts generally uphold the officers' decision that probable cause to arrest existed. *See, e.g., Radich v. Goode,* 886 F.2d 1391, 1398 (3d Cir.1989) (where the law is unclear, officers need not "correctly predict how a court will answer [the] unresolved and complex legal issue" to have probable cause) (citing *Michigan v. DeFillippo,* 443 U.S. 31, 39, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979)); *United Food & Commer. Workers Union, Local 72 v. Borough of Dunmore,* 40 F.Supp.2d 576, 588–90 (M.D.Pa. 1999) (good faith belief that law is being violated establishes probable cause where law "remains unclear"); *see also United States v. Calp,* 113 Fed. Appx. 358, 361 (10th Cir. 2004) ("Probable cause exists" where officers "reasonably rely on the plain language of a statute" even if the suspect subsequently challenges the constitutionality of his prosecution). Similarly, I conclude that the circumstances presented

here were "sufficient in themselves to warrant a reasonable person to believe" that Plaintiffs had committed a "lewd act which [was] likely to be observed by others who would be affronted or alarmed." *Marasco*, 318 F.3d at 514; 18 Pa.C.S. § 5901. Accordingly, I find that the Troopers had probable cause to arrest Plaintiffs for violating § 5901.

■ In the alternative, I conclude that because Plaintiffs actually violated § 5901, the Troopers—who witnessed the violation—had probable cause to arrest Plaintiffs. *See United States v. Pratt*, 355 F.3d 1119, 1123 (8th Cir.2004) (probable cause is established where officers witness criminal behavior). In reaching this conclusion, I must predict how the Pennsylvania Supreme Court would construe the open lewdness statute. *See Clark v. Modern Group, Ltd.*, 9 F.3d 321, 326 (3d Cir.1993) (when state law is unclear, federal courts "must forecast the position the supreme court of the forum would take on the issue").

The Pennsylvania Supreme Court has defined open lewdness as "an act of gross and open indecency," in violation of "community standards in respect to sexuality or nudity in public." *Commonwealth v. Heinbaugh*, 467 Pa. 1, 8, 354 A.2d 244 (Pa.1976). Total nudity in a public place constitutes a lewd act under Pennsylvania law. *See, e.g., Commonwealth v. Warner*, 51 Pa. D & C 2d 63 (Pa.Com.Pl.1971) (defendant wandered naked through a residential area and pizza parlor but did not engage in sexual or suggestive acts); *Commonwealth v. Davidson*, 220 Pa.Super. 451, 452, 289 A.2d 250 (Pa.Super.1972) (lewd act where defendant drove car while completely naked).

Partial nudity has also been found to be lewd, particularly when accompanied by behavior that focuses attention on intimate areas of the body. *See United States v. Malone*, 822 F.Supp. 1187, 1188 (E.D.Pa. 1993) (holding that defendant had committed a lewd but non-public act by rubbing genitals through his clothing). The Pennsylvania Superior Court has held, however, that a public appearance in a t-shirt and "tight-fitting briefs" is not a lewd act. *Commonwealth v. Williams*, 394 Pa.Super. 90, 574 A.2d 1161 (Pa.Super.1990) (defendant removed trousers to reveal briefs and walked through a parking lot).

In seeking to construe § 5901, I may look to "other statutes upon the same or similar subjects." *See* 1 Pa.C.S. § 1921; *Prudential Property & Casualty Ins. Co. v. Pendleton*, 858 F.2d 930, 935 (3d Cir. 1988). My review of those statutes confirms that the Pennsylvania Legislature has consistently penalized partial nudity in circumstances analogous to those presented here. For instance, Pennsylvania's obscenity statute defines "nudity" as including the showing of the "buttocks with less than a fully opaque covering." *See* 18 Pa.C.S. § 5903. Pennsylvania law prohibits the "invasion of privacy" of anyone "in a state of full or partial nudity," which is defined as the "[d]isplay of all or any part of the human genitals or pubic area or buttocks ... with less than a fully opaque covering." 18 Pa.C.S. § 7507.1. Pennsylvania law bars children under eighteen from all "adult-oriented establishments" where the "human genitals or pubic region; buttocks; or female breasts" are displayed while "less than completely or opaquely covered." 68 Pa.C.S. § 5501 *et seq.* Finally, Pennsylvania prohibits "lewd, immoral, and improper entertainment" in bottle clubs, defining entertainment as lewd when it includes "[a]ny person being touched, caressed or fondled on the buttocks." 18 Pa.C.S. § 7329.

In light of these statutes, I believe that under Pennsylvania law, Plaintiffs' deliberate, public display of the shape and move-

ment of their genitals and the entirety of their buttocks to children and others was a "gross and open" act that violated "community standards" respecting nudity. *Heinbaugh*, 467 Pa. at 8, 354 A.2d 244. State laws similar to § 5901 have been construed similarly. For instance, the Massachusetts Supreme Judicial Court recently held that a man violated Massachusetts' open lewdness statute when, clad in thong underwear, he lowered his pants and exposed his buttocks to four teenagers. *See Commonwealth v. Quinn*, 439 Mass. 492, 789 N.E.2d 138 (2003). Quinn contended that he did not violate the statute because he had kept his genitals covered. *Id.* at 493, 789 N.E.2d 138. Like § 5901, the Massachusetts statute included no definition of "lewdness," and derived from the common law. *Id.* at 493–95, 789 N.E.2d 138. The *Quinn* Court reviewed analogous case law from Florida, Michigan, Minnesota, Nevada, Vermont, Virginia, and West Virginia, and found that none of those decisions "cabin[ed] the offensive conduct to the intentional exposure of genitals." *Id.* Accordingly, the Supreme Judicial Court held that Quinn's deliberate exposure of his buttocks was a "lewd" act under Massachusetts law.

This authority convinces me that the Pennsylvania Supreme Court would hold that given the facts presented here—the presence of young children and unsuspecting adults, Plaintiffs' near-nudity, their exposure of the contours and movement of their genitals, and the number of individuals involved—Plaintiffs violated § 5901. Accordingly, the Troopers had probable cause to arrest Plaintiffs when they witnessed the protest.

**B. The Troopers Properly Based Their Probable Cause Determination On Plaintiffs' Expressive Conduct**

Plaintiffs also contend that their Fourth Amendment rights were necessarily violated if their First Amendment rights were violated, arguing:

> constitutionally protected free speech ... cannot, as a matter of law, establish probable cause that the individual is committing or about to commit illegal activity.... [I]f [Plaintiffs'] conduct is protected by the First Amendment then any seizure or arrest would be unreasonable under the Fourth Amendment as a matter of federal constitutional law.

*Pl. Mem.* at 30; *Pl. Reply Br.* at 3.

Plaintiffs base this contention on their belief that their thong-clad display was protected speech and thus could not be subject to any regulation. As I explain below, I do not believe that the First Amendment protects Plaintiffs' display from all regulation. *See* pp. 14–25, *infra.* Moreover, contrary to Plaintiffs' contention, a finding of probable cause may be based on protected expression. For example, all the Plaintiffs had the First Amendment right to speak freely during the July 9, 2004 rally. If any one of them had declared at the rally that he had just robbed a bank, however, the Troopers could certainly have based his arrest for robbery on that protected speech. *See, e.g., United States v. Washington*, 431 U.S. 181, 187, 97 S.Ct. 1814, 52 L.Ed.2d 238 (1977); *Brinegar v. United States*, 338 U.S. 160, 178, 69 S.Ct. 1302, 93 L.Ed. 1879 (Burton, J., concurring) (driver's statement that he had "not too much" liquor in his car established probable cause); *Radich v. Goode*, 886 F.2d 1391 (3d Cir.1989) (upholding probable cause based on officers' observation of protest activities).

In these circumstances, I cannot conclude that the First Amendment somehow barred the Troopers' probable cause determination.

## C. The District Attorney's Decision Not To Prosecute Is Unrelated To The Existence Of Probable Cause To Arrest.

In declining to prosecute Plaintiffs for disorderly conduct, the Lancaster County District Attorney made the following statement:

> However, to convict for Disorderly Conduct, it is not enough to show that certain conduct created a hazardous or physically offensive condition. The Commonwealth must also prove that the act committed by the defendants served no legitimate purpose on the part of the actors. Because this was symbolic conduct, designed to protest foreign policy in Iraq, current legal principles make clear that the Commonwealth cannot meet this burden.

*Def. S.J. Record,* Ex. 5, at SJ–20. Plaintiffs argue that because the District Attorney believed he could not prove Plaintiffs guilty of disorderly conduct, the Troopers necessarily did not have probable cause to arrest Plaintiffs for open lewdness. The contention collapses of its own weight.

First, the D.A.'s opinion related to disorderly conduct, not open lewdness. Even if the crimes were somehow analogous (which I do not believe), "probable cause does not require the officer to ... obtain proof beyond a reasonable doubt,"—the D.A.'s burden to convict. *Herman v. City of Millville,* 66 Fed. Appx. 363, 367 (3d Cir.2003). Further, a *prima facie* case requires a higher standard of proof than that required to establish probable cause. *See Stewart v. Abraham,* 275 F.3d 220, 230 (3d Cir.2001) (holding that under Pennsylvania law, "the standard of probable cause and the *prima facie* case standard are conceptually distinct"). Finally, even if the District Attorney—or, for that matter, the Troopers themselves—believed that probable cause for Plaintiffs'

arrest did not exist, their subjective beliefs are irrelevant to my objective inquiry. *Berg,* 219 F.3d at 272 (holding that "the arresting officer's subjective beliefs about the existence of probable cause are not relevant"); *see also Gliatta v. Jones,* 96 Fed. Appx. 249, 251 (5th Cir.2004) (advice of assistant district attorney that "probable cause did not exist" is irrelevant to objective inquiry into probable cause); *Craig v. Singletary,* 127 F.3d 1030, 1044 (11th Cir.1997) (holding that "the subjective beliefs of prosecutors [as to probable cause] are no more binding on courts than are those of police officers").

Accordingly, I conclude that the District Attorney's subjective view about the advisability of prosecution does not impugn the Troopers' correct determination that they had probable cause to arrest Plaintiffs.

## II. The Troopers Did Not Violate Plaintiffs' First Amendment Rights.

As Plaintiffs do not challenge § 5901's facial constitutionality, I must determine whether the statute "as applied to political expression like [theirs] violates the First Amendment." *See Pl. Br.* at 13 n. 7; *Texas v. Johnson,* 491 U.S. 397, 404 n. 3, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989). Accordingly, I first consider whether Plaintiffs' pyramid "constituted expressive conduct, permitting [them] to invoke the First Amendment in challenging" their arrest. *Id.* at 403, 109 S.Ct. 2533. I "next decide whether the [statute's] regulation is related to the suppression of free expression." *Id.* If § 5901 is "not related to expression, then the less stringent standard [ ] announced in *United States v. O'Brien*" will apply to this case. *Id.; see United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (establishing the four-part test for the constitutionality of "time, place, or manner" regulations of speech). If the *O'Brien* standard applies, I must

then examine whether the statute's application to Plaintiffs satisfies the four-part test.

### A. Plaintiffs Engaged In Expressive Conduct.

Like the defendants in *Texas v. Johnson*, the Troopers make the "prudent concession" that Plaintiffs actions were expressive conduct. *Def. Mem. in Opp. to Pl. Mot. for Part. S.J.* at 4; *Texas v. Johnson*, 491 U.S. at 406, 109 S.Ct. 2533. Although the First Amendment "literally forbids the abridgment only of 'speech,' [the Supreme Court has] long recognized that its protection does not end at the spoken or written word . . . [and] conduct may be sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments." *Texas v. Johnson*, 491 U.S. at 404, 109 S.Ct. 2533. Expressive conduct exists where "an intent to convey a particularized message was present, and the likelihood was great that the message would be understood by those who viewed it," or if the nature, context and environment of the conduct "was sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments." *Id.* (two-part "particularized message" test); *see also Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 160 (3d Cir.2002) (alternative test).

■ Plaintiffs argue persuasively that their pyramid constituted expressive conduct. It is undisputed that Plaintiffs intended to communicate a message of political protest. *See Pl. S.J. Record*, SJ–53 (Egolf Dep.), SJ–62–63 (Keely Dep.), SJ–77 (O'Bryant Dep.); *Def. Mem. in Opp.* at 4. Although they acknowledge that many people in the crowd "didn't have any idea what [they] were doing—what the pyramid was for," Plaintiffs also offer evidence that their pyramid was somewhat similar to the media depictions of Abu Ghraib. *Pl. S.J. Record* at SJ–89, SJ–2–8, *Expert Report of Dr. Todd Gitlin* at 8. At summary judgment, I must infer that "the likelihood was great" that at least some of "those who viewed" the display would understand it as a political protest. *Texas v. Johnson*, 491 U.S. at 404, 109 S.Ct. 2533; *Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. 2505. I therefore find that Plaintiffs' pyramid was "sufficiently imbued with elements of communication" to implicate the First Amendment. *Spence* at 409.

### B. Pennsylvania's Open Lewdness Statute Is Content–Neutral.

"Even where expressive conduct takes place in a public forum," the government may impose reasonable, content-neutral restrictions on that conduct. *United States v. Kalb*, 234 F.3d 827, 832 (3d Cir. 2000), *cert denied* 534 U.S. 1113, 122 S.Ct. 918, 151 L.Ed.2d 884 (2002). Whether or not § 5901 is content-neutral will determine whether I must review the statute and its application to Plaintiffs under a stringent, "strict scrutiny" standard or the more-relaxed standard set forth in *United States v. O'Brien*. *Texas v. Johnson* 491 U.S. at 407–10, 109 S.Ct. 2533; *O'Brien*, 391 U.S. at 377, 88 S.Ct. 1673 (quoted and applied *infra* pp. 21–24). My "principal inquiry" in evaluating the statute's content-neutrality is to determine whether the government adopted the regulation "because of disagreement with the message it conveys." *Hill v. Colorado*, 530 U.S. 703, 719, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000).

■ Controlling authority, the circumstances presented here, and the language of the statute itself all confirm that § 5901 is content-neutral. The Supreme Court has held that generally, "government restrictions on public nudity . . . should be evaluated under the framework set forth

in [*United States v.*] *O'Brien* for content-neutral restrictions on symbolic speech." *City of Erie, et al. v. Pap's A.M.*, 529 U.S. 277, 289, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000). Like the Pennsylvania public indecency statute found to be content-neutral in *City of Erie*, § 5901 "does not target" expressive conduct, but extends to all publicly lewd and indecent conduct, "regardless of whether that nudity is accompanied by expressive activity." *Id.* at 289, 120 S.Ct. 1382. *Compare United States v. Eichman*, 496 U.S. 310, 317–18, 110 S.Ct. 2404, 110 L.Ed.2d 287 (1990) ("[T]he precise language of the Act's prohibitions confirms Congress' interest in the communicative impact of flag destruction.... Its restriction on expression cannot be justified without reference to the content of the regulated speech.") (internal quotations omitted).

Further, Plaintiffs "do not suggest that the Troopers arrested Plaintiffs for expressing a particular political view (*i.e.* against President Bush or against the war in Iraq)." *Pl. Br.* at 14, n. 8. Indeed, Plaintiffs must make this concession, given the presence of small children within feet of Plaintiffs' pyramid, and the Troopers' failure to arrest any of the numerous anti-Bush demonstrators—including Ms. Dimitris and Mr. Rhineer—who remained clothed. *Pl. S.J. Record* at SJ–82 (O'Bryant Dep.); *Jones Dep.* at 38; *Pl. Mem.* at 11. Similarly, Plaintiffs do not allege that the Commonwealth has used § 5901 "as a pretext for closing down" expressive activities by enforcing it only "against those who choose to exercise ... First Amendment rights." *Arcara v. Cloud Books*, 478 U.S. 697, 708, 106 S.Ct. 3172, 92 L.Ed.2d 568 (1986) (O'Connor, J., concurring); *United States v. Steele*, 461 F.2d 1148, 1151 (9th Cir.1972). *See also Barnes*, 501 U.S. at 574, 111 S.Ct. 2456 (observing that an otherwise content-neutral statute could be subject to strict scru-

tiny if enforced against "only communicative conduct").

Finally, the history of § 5901 shows that it is "a restatement of [a] common law offense," and was not created to make illicit a particular type of message content. *Commonwealth v. Allsup*, 481 Pa. 313, 318, 392 A.2d 1309 (1978). This statute's language is identical to that set forth in the Model Penal Code, codifying common-law prohibitions against lewdness and indecency. *See Conchatta, Inc. v. Evanko*, 2005 WL 426452 at * 1, 2005 U.S. Dist. LEXIS 2638, *4 (E.D.Pa. Feb. 23, 2005); *Heinbaugh*, 467 Pa. at 8, 354 A.2d 244 ("The comment to that section makes it clear that the drafters intended to codify the pre-existing common law."). Virtually all states, including Pennsylvania, banned acts of public lewdness and indecency at common law. *See, e.g., State v. Millard*, 18 Vt. 574 (Vt.1846) (collecting citations); *Commonwealth v. Hardin*, 10 Ky. Op. 925 (Ky. 1880) *Van Houten v. State*, 46 N.J.L. 16, 17 (N.J.1884); *Commonwealth v. Broadland*, 315 Mass. 20, 21–22, 51 N.E.2d 961 (Mass.1943); *Messina v. State*, 212 Md. 602, 605–06, 130 A.2d 578 (Md.1957).

Over time, virtually every state codified these common-law prohibitions. *See* 94 A.L.R.2d 1353 at § 7 (noting that "the statutes have adopted the common-law requirements"); 11 Del. C. § 1341; N.J. Stat. sec. 2C:14–4; N.Y. Penal Law § 245.00; *see also State v. Zeidell*, 154 N.J. 417, 429, 713 A.2d 401 (1998) (interpreting statute with reference to common law); *People v. Darryl M.*, 123 Misc.2d 723, 475 N.Y.S.2d 704 (N.Y.Crim.Ct.1984) (same); *State v. Cota*, 99 Ariz. 233, 237, 408 P.2d 23 (1965) (tracing common law origins of Tucson City Code § 11–28(1)). In adopting these statutes, state legislatures acted to protect public decency and morality—not to prohibit conduct with communicative elements. *See Duvallon v.*

*District of Columbia,* 515 A.2d 724, 729 (D.C.Ct.App.1986) (Pryor, C.J., dissenting) (purpose is "to protect the public from being confronted in public places by annoying, shocking, or embarrassing displays of nudity or sexual activity") (citing 2 J. BISHOP, *New Criminal Law,* § 1125, at 671 (8th ed. 1892)); *People v. Legel,* 24 Ill. App.3d 554, 557, 559, 321 N.E.2d 164 (1974) (purpose of Illinois statute is "to protect the public from shocking and embarrassing displays") (citing legislative history). Section 5901 is of a piece with these innumerable statutes. *See Barnes* 501 U.S. at 573–74, 111 S.Ct. 2456; Official Comment, 18 Pa.C.S. § 5901 (1972) ("This section is derived from Section 251.1 of the Model Penal Code and makes no radical change in existing law"); *Heinbaugh,* 467 Pa. at 8, 354 A.2d 244 ("[T]he statutory language . . . must be read as restating the established common law standard which has long existed in this Commonwealth.").

In these circumstances, I believe Pennsylvania has "an interest in support of [Plaintiff's arrest] that is unrelated to the suppression of expression." *Texas v. Johnson,* 109 S.Ct. at 2541. Plaintiffs nonetheless argue that their arrest was not content-neutral because it was based on their partial nudity which, in their view, was the gist of their "political message." *Pl. Br.* at 14–15. The Supreme Court has rejected this endlessly reductive argument, however, noting that "simply to define what is being banned as the 'message' is to assume the conclusion." *See City of Erie,* 529 U.S. at 292–93, 120 S.Ct. 1382. *See also Troster v. Pa. Dep't of Corrections,* 65 F.3d 1086, 1093 (3d Cir.1995) ("virtually any prohibited conduct can be performed for an expressive purpose—if only expressive of the fact that the actor disagrees with the prohibition") (internal quotation marks and emphasis omitted). Thus, "[t]he government's purpose is the controlling consideration [—a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989); *see also R.A.V. v. City of St. Paul,* 505 U.S. 377, 385, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992).

In sum, I conclude that § 5901 is content-neutral. Pennsylvania did not adopt § 5901 because it wished to prevent nudity from being used to convey a message, but to discourage public nudity itself. Accordingly, I am obligated to evaluate § 5901 under the more relaxed *O'Brien* four-part test.

## C. Plaintiffs' Exposure Of Their Buttocks Was Not "Pure Speech."

■ Plaintiffs contradict themselves, arguing both that their actions constituted "expressive conduct," and that applying the *O'Brien* test here is inappropriate because their behavior was " 'pure' speech," and not expressive conduct. *Pl. Mem.* at 16; *Pl. Br.* at 10–12. If the pyramid was "pure speech," Plaintiffs' arrest would be subject to strict scrutiny review. *See Texas v. Johnson,* 109 S.Ct. at 2540 ("The government generally has a freer hand in restricting expressive conduct than in restricting the written or spoken word."). I do not believe the pyramid was pure speech, however.

Courts must apply the *O'Brien* test to evaluate the constitutionality of regulating " 'speech' and 'nonspeech' elements which are combined in the same course of conduct." *O'Brien,* 391 U.S. at 376, 88 S.Ct. 1673. Although it is a "sometimes hazy line distinguishing conduct from pure speech," this is not a case where there is just "some kernel of conduct in [an] act of expression." *See Brown v. Hartlage,* 456

U.S. 45, 55, 102 S.Ct. 1523, 71 L.Ed.2d 732 (1982); *Trotman v. Board of Trustees*, 635 F.2d 216, 226 (3d Cir.1980). It is difficult to imagine how I could find that removing one's clothing and kneeling with one's buttocks exposed is not conduct.

Indeed, the manner in which Plaintiffs presented their protest confirms that those forming the pyramid were not engaged in pure speech. They recruited others to engage in "pure speech" to explain the meaning of the pyramid: Dan Rhineer, the cameraman, who "explain[ed] to those around the pyramid that [it] was a symbolic reenactment," and Kara Dimitris, holder of the sign declaring "Great War, George." *See Pl. S.J. Record* at SJ–53, SJ–57 (Egolf Dep.); SJ–228 (Rhineer Decl.). As the Supreme Court recently observed, "[t]he fact that such explanatory speech is necessary is strong evidence that the conduct at issue here is not so inherently expressive that it warrants protection." *Rumsfeld v. FAIR*, —— U.S. ——, 126 S.Ct. 1297, 1311, 164 L.Ed.2d 156 (2006). Indeed, in their Motion for Partial Summary Judgment, Plaintiffs distinguished the "expressive, symbolic conduct" of the pyramid from the " 'pure' speech in the form of a very large sign … and the verbal explanations of the group's cameraman." *Pl. Mem.* at 19.

Plaintiffs also argue that some conduct "crucial to public debate" should be treated as "pure speech" because it "simultaneously may give rise to an expressive conduct claim and to claims based on alternative theories." *See Pl. Br.* at 12, n.6 (citing *FAIR v. Rumsfeld*, 390 F.3d 219, 243–44 (2004), *reversed Rumsfeld v. FAIR*, —— U.S. ——, 126 S.Ct. 1297). Yet, Plaintiffs have not identified any "alternative theories" warranting the treatment of their conduct as "pure speech." *Compare FAIR v. Rumsfeld* 390 F.3d at 244 (identifying free association and compelled speech as alternative First Amendment

theories warranting the application of strict scrutiny). Once again, in these circumstances, I conclude that I am obligated to apply *O'Brien's* four-part test in evaluating § 5901's constitutionality.

### D. Pennsylvania's Open Lewdness Statute is Constitutional As Applied To Plaintiffs.

 I must evaluate an as-applied challenge to a content-neutral restriction on the "time, place, or manner" of public speech under "the same standards as those set forth in *United States v. O'Brien*." *Barnes* 501 U.S. at 566, 501 U.S. 560:

[A] government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*O'Brien*, 491 U.S. at 376–77, 109 S.Ct. 2522. Plaintiffs' arrest under § 5901 satisfies these four standards.

First, the Commonwealth certainly has the constitutional authority to enact and enforce its lewdness statute. "The traditional police power of the States is defined as the authority to provide for the public health, safety, and morals," and has long been upheld as the basis for legislation. *Barnes* 501 U.S. at 569, 111 S.Ct. 2456; *Tunick v. Safir*, 209 F.3d 67, 91 (2d Cir. 2000) (Sack, J., concurring) (observing that there can be "little doubt that the City of New York can stop a large group of men and women from undressing on a public street … even if the members of the group do so for the purpose and in the course of creating expression"); *Greater N.Y. Metro. Food Council, Inc. v. Giulia-*

*ni,* 195 F.3d 100, 109 (2d Cir.1999) ("regulations directed at the safety and welfare of children lie at the heart of the states' police powers").

Second, the statute furthers an important or substantial government purpose. The government's interest in "regulating conduct through a public nudity ban ... [is] undeniably important." *City of Erie,* 529 U.S. at 296, 120 S.Ct. 1382; *see also Barnes,* 501 U.S. at 569, 111 S.Ct. 2456 ("[T]he public indecency statute furthers a substantial government interest in protecting order and morality."). This interest is greatest when the government acts to protect children. *See Playboy Entertainment Group v. United States,* 30 F.Supp.2d 702, 715 (D.Del.1998) (holding that where a harm to children exists, "there is no doubt the State has a compelling interest in regulating it"); *see also* p. 10, *supra* (identifying Pennsylvania statutes extending this protective purpose to partial nudity).

Unlike *Texas v. Johnson*—where the Supreme Court found that the state's interest in support of the restriction was "not implicated on th[e] record"—the Commonwealth's interest in discouraging public nudity plainly was implicated here. *See Texas v. Johnson,* 491 U.S. at 407, 109 S.Ct. 2533. Plaintiffs removed their clothing in the presence of both unsuspecting adults and young children. *See Barnes,* 501 U.S. at 568, 111 S.Ct. 2456 (the government's interest in "moral disapproval of people appearing in the nude among strangers in public places" is sufficient to uphold the challenged public indecency law against an as-applied challenge). Thus, the arrest of Plaintiffs for violating § 5901 plainly satisfies the second prong of the *O'Brien* test.

The third *O'Brien* factor—whether the government interest is unrelated to the suppression of free expression—is similar to the question of content-neutrality. *See*

*City of Erie,* 529 U.S. at 301, 120 S.Ct. 1382 (applying the Court's analysis of "what level of scrutiny applies" to satisfy the third factor in *O'Brien* ). As discussed, the Commonwealth's interest in limiting Plaintiffs' near-nudity is not related to the content of their message. *See* Part II.B, *supra.* Plaintiffs' argument— that they were "expressing themselves" through their near-nudity—does not change this conclusion. *See Barnes,* 501 U.S. at 570–71, 111 S.Ct. 2456 ("Public nudity is the evil the State seeks to prevent, whether or not it is combined with expressive activity."). Accordingly, the Troopers' arrest of Plaintiffs for violating § 5901 satisfies the third *O'Brien* factor.

The fourth *O'Brien* factor requires that I examine whether the restriction on First Amendment freedoms is no greater than necessary to fulfill the government's interest. *See Turner Broadcasting Systems, Inc. v. FCC,* 512 U.S. 622, 662, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) ("no greater than necessary" test is an "intermediate level of scrutiny" more easily satisfied than by the "least restrictive means"); *see also Ward v. Rock against Racism,* 491 U.S. 781, 797, 109 S.Ct. 2746, 105 L.Ed.2d 661 (holding that a "less-restrictive-alternative analysis ... has never been a part of the inquiry into the validity of a time, place, and manner regulation."). Here, the interest served by § 5901 is to protect children and unsuspecting adults from the nudity and near-nudity of strangers in public places. *See City of Erie,* 529 U.S. at 296, 120 S.Ct. 1382; *Barnes,* 501 U.S. at 569, 111 S.Ct. 2456. I do not see how Pennsylvania can advance these legitimate interests except by prohibiting lewdness in circumstances "likely to be observed by others who would be affronted or alarmed," and then enforcing the prohibition against those who violate it, as Plaintiffs did here. *See* 18 Pa.C.S. § 5901;

Part I.A, *supra* (concluding that Plaintiffs violated the statute).

Plaintiffs suggest that the Troopers might have "engaged the Plaintiffs first, to confirm ... that this was a symbolic political protest." *Pl. Br.* at 15. I believe this "alternate means" would have eviscerated the Commonwealth's interest in regulating public lewdness: while the Troopers "engaged" Plaintiffs, the children and others present would have been exposed to Plaintiffs' near-nudity. Moreover, requiring the Troopers to have questioned Plaintiffs about the nature and purpose of their actions would be troubling. For instance, such an interrogation requirement strongly suggests that the Troopers would be compelled to make an impermissible content-based decision about the propriety of speech. *Compare Police Dep't of Chicago v. Mosley,* 408 U.S. 92, 95–96, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972) (subjecting picketing restrictions to strict scrutiny where they were not applied equally to all speakers and all messages). In these circumstances, I believe that both § 5901's restrictions and the manner in which they were applied are no greater than necessary to fulfill the Commonwealth's interests.

In sum, I believe that like the statute itself, the Troopers' enforcement of § 5901 complied with the First Amendment. Indeed, to hold the Troopers' application of § 5901 unconstitutional would effectively render the statute unenforceable. Yet Plaintiffs themselves concede that the statute is *not* facially unconstitutional. *See Pl. Br.* at 9–10, 13 n. 7. The Third Circuit has held that the Constitution does not require Pennsylvania to exempt those with political messages from the application of its laws; rather, it is "free to classify and draw lines" of acceptable conduct and arrest those who cross those lines. *See Mitchell v. Commission on Adult Ent. Establish-*

*ments,* 10 F.3d 123, 138 (3d Cir.1993). In exposing themselves in the manner they did on July 9, 2004, Plaintiffs crossed the line set out in § 5901. Because the Troopers' response comported with the four-prong *O'Brien* test, they applied § 5901 in a constitutional manner.

## III. Defendants Are Entitled To Qualified Immunity Because A Reasonable Person Would Not Have Believed They Were Violating Clearly Established Rights.

The Troopers also invoke the defense of qualified immunity, which shields government officials from liability whenever "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *McGreevy v. Stroup,* 413 F.3d 359, 364 (3d Cir.2005) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). The Third Circuit has held that qualified immunity provides "ample protection to all but the plainly incompetent or those who knowingly violate the law." *Blackhawk v. Pennsylvania,* 381 F.3d 202, 215 (3d Cir.2004).

The Supreme Court has directed that regardless of whether the rights at issue are ones that "a reasonable person would have known" or are "clearly established," I must begin my evaluation of a qualified immunity defense by determining whether any constitutional rights have been violated. *See Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (explaining that the Court "insist[s] upon turning to the existence or nonexistence of a constitutional right as the first inquiry"). I "must next determine whether [that right] was a clearly established one, about which a reasonable person would have known." *McGreevy,* 413 F.3d at 364 (quoting *Gruenke v. Seip,* 225 F.3d 290, 298 (3d Cir.2000)). "Clearly established"

means " 'some but not precise factual correspondence' between relevant precedents and the conduct at issue," although "officials need not predict the future course of constitutional law." *McLaughlin v. Watson*, 271 F.3d 566, 571 (3d Cir.2001) (quoting *Ryan v. Burlington County*, 860 F.2d 1199, 1208–09 (3d Cir.1988)). Accordingly, the Troopers are entitled to qualified immunity if "a reasonable officer could have believed that the challenged conduct was lawful under the circumstances." *Blackhawk*, 381 F.3d at 215.

I have already concluded that the Troopers did not violate Plaintiffs' First or Fourth Amendment rights. *See* Part I, Part II, *supra*. The typical qualified immunity inquiry would end here. *McGreevy*, 413 F.3d at 364; *see Saucier*, 533 U.S. at 201, 121 S.Ct. 2151 ("[T]here is no necessity for further inquiries concerning qualified immunity," unless a constitutional violation is established). Nevertheless, "qualified immunity is an entitlement not to stand trial or face the other burdens of litigation," and the Supreme Court "repeatedly [has] stressed the importance of resolving immunity questions at the earliest possible stage." *Bennett v. Murphy*, 274 F.3d 133, 136 (3d Cir.2002) (quoting *Mitchell v. Forsyth*, 472 U.S. 511 at 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)); *Wright v. City of Philadelphia*, 409 F.3d 595, 599 (3d Cir.2005). To provide certainty to the parties, courts may therefore also determine whether a right is "clearly established." *See Robinson v. Arrugueta*, 415 F.3d 1252, 1256 (11th Cir.2005) (conducting both steps of the qualified immunity analysis after finding no constitutional violation); *Vives v. City of New York*, 405 F.3d 115, 118–19 (2d Cir.2005) (same).

In light of the open state law question I have been compelled to resolve, and the virtual certainty that my decision in this case will be appealed (*see Dec. 16, 2005 Tr.*

at 35), I will determine whether I may grant the Troopers' summary judgment motion on the alternative ground of qualified immunity.

## A. Qualified Immunity Protects The Troopers From Plaintiffs' Fourth Amendment Claims.

■ Assuming, *arguendo*, that the Troopers did not have probable cause to arrest Plaintiffs under § 5901, the circumstances presented here entitle the Troopers to the protection of qualified immunity.

Plaintiffs contend that the Troopers' belief that Plaintiffs' near-nudity violated § 5901 was unreasonable because: 1) the Pennsylvania Superior Court has purportedly suggested that only total public nudity would violate the statute; and 2) "American culture has accepted extensive exposure of skin and partial nudity in public places." *Pl. Br.* at 21–22. I do not agree.

First, Plaintiffs have mischaracterized the Superior Court's dictum. In *Commonwealth v. Williams*, the Court held that a man wearing a t-shirt and brief underwear in a parking lot at night, who was viewed by an adult looking out her apartment window, did not violate § 5901. *See* 394 Pa.Super. 90, 92, 96, 574 A.2d 1161 (1990). In explaining its decision, the Court noted that "Section 5901 extends only to conduct that ... involves public nudity," but left unresolved whether partial nudity would satisfy the definition of open lewdness. *Id.* at 96, 574 A.2d 1161.

Plaintiffs' second contention—that because American culture is awash with underwear advertisements the American public has become inured to partial nudity—is equally unpersuasive. *See Pl. Br.* at 10 n. 2; *Gitlin Report* at 9, Ex. D. Plaintiffs' exposure of their buttocks and the contours of their genitals was live, in contrast to the settings—print, television, the

Internet—in which Plaintiffs contend that partial nudity is pervasive. Further, Plaintiffs' display—in the presence of small children, at a gathering of onlookers awaiting a Presidential motorcade—was unexpected. Plaintiffs offer no legal authority supporting their contention that the "extensive exposure of skin and partial nudity" in American society has undercut the continued viability of lewdness and indecency laws. *See Pl. Br.* at 22. To the contrary, as the Massachusetts Supreme Judicial Court's opinion in *Quinn* illustrates, legal restrictions on public lewdness remain viable. *See* 439 Mass. 492, 789 N.E.2d 138; *cf. New Jersey v. Vogt,* 341 N.J.Super. 407, 775 A.2d 551 (N.J.App. 2001) (affirming continued viability of lewdness and indecency statute). Pennsylvania courts have also held that acts of public nudity violate § 5901. *See, e.g., Commonwealth v. Heinbaugh,* 467 Pa. 1, 354 A.2d 244 (1976); *Commonwealth v. Falcone,* 202 Pa.Super. 474, 198 A.2d 421 (Pa.Super.1964). As I have described, the Pennsylvania Legislature has defined nudity to include the display of buttocks in analogous contexts, including "adult-oriented establishments" and bottle clubs. *See* Part I.A., *supra* (citing 68 Pa.C.S. § 5501 *et seq.* (adult oriented establishments); 18 Pa.C.S. § 7329 (bottle clubs).

Moreover, the Supreme Court has made clear that police officers are not obligated to analyze a statute's constitutionality before enforcing it:

> Police are charged to enforce laws until and unless they are declared unconstitutional. The enactment of a law forecloses speculation by enforcement officers concerning its constitutionality— with the possible exception of a law so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws. Society would be ill-served if its police officers took it upon themselves to determine

which laws are and which are not constitutionally entitled to enforcement.

*Michigan v. DeFillippo,* 443 U.S. 31, 38, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979). Accordingly, "[e]ven if the statute is arguably unconstitutional," the Troopers were "obligated to enforce it, and [are] entitled to qualified immunity for any constitutional violation that might have resulted." *Autrey v. City of Lancaster,* 2003 U.S. Dist. LEXIS 7694 (E.D.Pa. Apr. 17, 2003). *See also Grossman v. City of Portland,* 33 F.3d 1200, 1209 (9th Cir.1994) ("Where a police officer has probable cause to arrest someone under a statute that a reasonable officer could believe is constitutional, the officer will be immune from liability even if the statute is later held to be unconstitutional."). Even where a statute is later determined to be unconstitutional, officers may constitutionally conclude that they have probable cause to arrest. *See Schlaflin v. Borowsky,* 128 Fed. Appx. 258 (3d Cir.2005), *cert* denied —— U.S. ——, 126 S.Ct. 552, 163 L.Ed.2d 461 (2005) (upholding arrest against Fourth Amendment challenge despite finding unconstitutional the statute on which officers based the arrest); *Bernstein v. Aivazis,* 584 F.Supp. 606, 607 (D.N.J.1983) ("The offense charged having been committed in the presence of the police officer, there was probable cause to arrest ... even though the statute ... is later declared unconstitutional.").

Finally, when they acted on July 9, 2004, the Troopers did not have the luxury of first consulting with counsel or considering the wealth of case law discussed here. Rather, like so many law enforcement decisions, the decision to arrest Plaintiffs necessarily was made as events quickly unfolded. *See Gilles,* 427 F.3d at 207 ("Under qualified immunity, police officers are entitled to a certain amount of deference for ... 'split-second judgments—in

circumstances that are tense, uncertain, and rapidly evolving.'") (quoting *Saucier*, 533 U.S. at 204–05, 121 S.Ct. 2151). Thus, while they were guarding the route of a Presidential motorcade, the Troopers witnessed seven young men strip down to flimsy thong underwear in the presence of a crowd containing children. In these circumstances, if the Troopers mistakenly concluded that Plaintiffs had committed an act of open lewdness, I believe it was a "reasonable mistake." Accordingly, I conclude that the defense of qualified immunity protects the Troopers from Plaintiffs' Fourth Amendment claims.

**B. Qualified Immunity Protects the Troopers From Plaintiffs' First Amendment Claims.**

■ Assuming, *arguendo*, that Plaintiffs' First Amendment rights were violated, I nonetheless conclude that the Troopers are protected by qualified immunity. In First Amendment claims brought under § 1983, courts have generally found the law to be "clearly established" only in those circumstances: 1) where the "relevant principles" of First Amendment law "apply with obvious clarity to the specific conduct in question"; or 2) where a "closely analogous case" holds the conduct unconstitutional and no "reasonable official could have distinguished" it. *See Hope v. Pelzer*, 536 U.S. 730, 739–40, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002); *Galvin v. Hay*, 361 F.3d 1134 (9th Cir.2004); *Paff v. Kaltenbach*, 204 F.3d 425, 433 (3d Cir. 2000); *Blair v. Evansville*, 361 F.Supp.2d 846 (S.D.Ind.2005). Here, neither approach suggests that Plaintiffs have asserted First Amendment rights that were "clearly established" at the time of their protest.

Under the first approach, I must set forth the "general constitutional rule[s] already identified," and then examine wheth-

er a reasonable officer "could have believed that his conduct was lawful" in light of those principles and the available facts. *Hope*, 536 U.S. at 741, 122 S.Ct. 2508; *Paff*, 204 F.3d at 431. As I have explained, several general constitutional rules "apply with obvious clarity" to the circumstances here. First, any speech protected by the First Amendment—including political speech—may be regulated according to content-neutral, time, place, or manner provisions. *See O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672; *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 805, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) (upholding content-neutral regulation of campaign signs). Moreover, broadly-applicable regulations of public nudity are content-neutral, even when they restrict protected expression such as nude dancing and other artistic endeavors. *See City of Erie*, 529 U.S. 277, 120 S.Ct. 1382, 146 L.Ed.2d 265; *Tunick*, 209 F.3d 67 (nude art performance). The police may therefore enforce content-neutral regulations that are validly promulgated and restrict no more speech than is necessary to serve an important governmental purpose. *See O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672; *Barnes*, 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504. Finally, content-neutral regulations may be enforced even against protesters who are engaged in political speech, "the core concern of the First Amendment." *See R.A.V.*, 505 U.S. at 385, 112 S.Ct. 2538 (affirming the applicability of content-neutral regulations to political speech); *Vincent*, 466 U.S. at 805, 104 S.Ct. 2118 (upholding limits on political campaign signs); *Saxe v. State College Area Sch. Dist.*, 240 F.3d 200, 210 (3d Cir.2001).

The obvious application of these principles to the situation confronting the Troopers on July 9, 2004, does not lead me to "believe that a reasonable officer would

understand the caselaw to mandate a conclusion" that arresting Plaintiffs was unlawful. *Paff*, 204 F.3d at 433. Rather, "a reasonable law enforcement officer with knowledge of the relevant legal principles and the information available would have done exactly what [the Troopers] did here." *Id.* at 434. In light of the nude dancing cases—*Barnes* and *City of Erie*—a reasonable officer could certainly conclude that § 5901 is content-neutral, enacted to protect the public from acts of public nudity. Given the presence of young children and unsuspecting adults, a reasonable officer could further believe that immediately arresting Plaintiffs was the only way to serve the purposes underlying § 5901. *See Turner Broadcasting*, 512 U.S. at 662, 114 S.Ct. 2445. Moreover, the Troopers—like all law enforcement officers—are "ordinarily entitled to rely on" the presumption of constitutionality attached to a "duly-enacted statute." *Grossman v. City of Portland*, 33 F.3d 1200, 1209 (9th Cir. 1994); *see also Connecticut ex rel. Blumenthal v. Crotty*, 346 F.3d 84, 102 (2d Cir.2003) ("absent contrary direction, state officials and those with whom they deal are entitled to rely on a presumptively valid state statute") (quoting *Lemon v. Kurtzman*, 411 U.S. 192, 208, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973)). Accordingly, a reasonable officer would have believed that—as with any time, place, or manner regulation—enforcement of § 5901 was permissible even against protesters engaged in political speech.

Plaintiffs contend, however, that "closely analogous" First Amendment authority provided Troopers fair warning that Plaintiffs' arrests were unconstitutional. *See Pl. Br.* at 4, 17 (citing *Cohen v. California*, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971); *Texas v. Johnson* ). In fact, the authority Plaintiffs offer is not closely analogous. In *Cohen*, the Supreme Court reversed the conviction of a protester who had displayed an obscene phrase ("F[*]ck the Draft") on his clothing. The Court expressly noted that the conviction was based on "speech," and not "any separately identifiable conduct." *Cohen*, 403 U.S. at 16, 91 S.Ct. 1780. In arresting Plaintiffs for their lewd conduct, the Troopers had no reason even to consider *Cohen*. Plainly, the "general constitutional rule" identified in *Cohen* does not "apply with obvious clarity to the specific conduct in question" here. *Hope*, 536 U.S. at 741, 122 S.Ct. 2508.

Equally inapt is Plaintiffs' contention that the reversal of a flag-burning conviction in *Texas v. Johnson* is "closely analogous" and demonstrated that Plaintiffs' arrest would violate "clearly established" First Amendment rights. The *Texas v. Johnson* Court reversed a conviction under Texas's anti-flag burning law because the law was *not* content-neutral. The Supreme Court has suggested that it could well come to a different conclusion with respect to the application of a content-neutral law—like "an ordinance against outdoor fires"—to flag-burning. *R.A.V.*, 505 U.S. at 385, 112 S.Ct. 2538; *see also United States v. Eichman*, 496 U.S. 310, 316, 110 S.Ct. 2404, 110 L.Ed.2d 287 (1990) (holding that statutes targeting the "communicative impact" of flag-burning are unconstitutional while reserving the question of whether flag-burning could be limited by other "laws regulating conduct"). Thus, *Texas v. Johnson* stands for the unassailable proposition that states may not prohibit protected expression based on its content. As neither the Commonwealth nor the Troopers based their actions here on Plaintiffs' communicative expression, I cannot conclude that *Texas v. Johnson* "clearly established" Plaintiffs' First Amendment rights.

Authority that actually is "closely analogous" confirms that the Troopers could

have reasonably believed Plaintiffs' arrest to be lawful. For instance, numerous courts have upheld the constitutionality of convictions for public nudity. *See, e.g., United States v. Biocic,* 928 F.2d 112 (4th Cir.1991) (the claim of a right to public nudity "has long been flatly rejected"); *SOB, Inc. v. County of Benton,* 317 F.3d 856 (8th Cir.2003); *People v. Hollman,* 68 N.Y.2d 202, 507 N.Y.S.2d 977, 500 N.E.2d 297 (N.Y.Ct.App.1986); *Iowa v. Nelson,* 178 N.W.2d 434 (Iowa 1970). Likewise, courts have regularly upheld the enforcement of content-neutral conduct restrictions against political protesters who violate them. *See, e.g., Faustin v. City & County of Denver,* 423 F.3d 1192 (10th Cir.2005) (protester who waved a political banner from a highway overpass); *Vlasak v. Superior Court of Cal.,* 329 F.3d 683 (9th Cir.2003) (protester's prop violated ordinance limiting protesters' ability to carry wooden objects); *Douglas v. Brownell,* 88 F.3d 1511 (8th Cir.1996) (picketing ordinance upheld). *Cf. Olaniyi v. District of Columbia,* 2006 WL 389743 (D.D.C.2006) (granting qualified immunity for arrest of demonstrators in the U.S. Capitol building). In light of this authority, the Troopers would not reasonably conclude that "closely analogous" cases prohibited their arrest of Plaintiffs.

The undisputed facts and the often confusing case law convince me that Plaintiffs' right to demonstrate publicly in thong underwear was *not* "clearly established" as "any reasonable person would have known." *McGreevy,* 413 F.3d at 364. On the contrary, I believe that any reasonable person—seeing Plaintiffs' near-nude display in the presence of children and adults awaiting the President's visit—would have concluded that the First Amendment did not protect Plaintiffs' conduct. Accordingly, I conclude that if the Troopers violated Plaintiffs' First Amendment rights, they are nonetheless protected by qualified immunity.

## CONCLUSION

Plaintiffs contend that because they were engaged in expressive activity, their arrest necessarily violated the First Amendment. *See Pl. Reply Br.* at 3–4; *Pl. Br.* at 20 ("a state law, regardless of its history, how it is written, or whether it is clearly established, simply cannot be utilized" against individuals engaged in political protest). Yet, the Supreme Court has never held that the First Amendment immunizes all expressive conduct from state regulation. In fact, the Court has held exactly the opposite: "[t]he guarantees of the First Amendment have never meant 'that people who want to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please.'" *Greer v. Spock,* 424 U.S. 828, 836, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976) (quoting *Adderley v. Florida,* 385 U.S. 39, 48, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966)); *Pl. Br.* at 3–4. Once this "immunity" contention is rejected, there is little left to support Plaintiffs' position. Accordingly, I conclude that in adopting § 5901 and in enforcing it against Plaintiffs on July 9, 2004, the Commonwealth of Pennsylvania and the Defendant State Troopers violated no one's Constitutional rights. Having considered the complex case law and the circumstances presented, I also believe the Troopers are entitled to qualified immunity for their actions. Accordingly, I grant Defendants' Motion for Summary Judgment and deny Plaintiffs' Motion for Partial Summary Judgment.