

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-22-2008

# Egolf v. Witmer

Precedential or Non-Precedential: Precedential

Docket No. 06-2193

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Egolf v. Witmer" (2008). *2008 Decisions.* Paper 1089.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/1089

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 06-2193
_____

TRISTAN P. EGOLF; ADAM CLAYTON WILLARD;
JONATHAN A. KOHLER; DAVID JC OBRYANT;
BENJAMIN D. KEELY; PAULA EGOLF;
GARY LEE EGOLF,

Appellants

v.

CHRISTOPHER WITMER; JAMES ELY; DEB KOLB;
GERALD KLING; D.J. KLING, IN THEIR INDIVIDUAL
CAPACITIES AS POLICE OFFICERS FOR EAST
LAMPETER TOWNSHIP; LINDA GEROW; BLAINE
HERTZOG; WAYNE KLINE; JOHN/JANE DOE 1 TO 5 IN
THEIR INDIVIDUAL CAPACITIES WHO ARE
UNKNOWN STATE ACTORS; JOHN/JANE DOE 6 TO 10
IN THEIR INDIVIDUAL CAPACITIES WHO ARE
UNKNOWN FEDERAL EMPLOYEES, AGENTS OR
ACTORS; CHRISTOPHER JONES, IN THEIR
INDIVIDUAL CAPACITIES AS POLICE OFFICERS FOR
EAST LAMPETER TOWNSHIP; MARIAN ADAMS, in
their individual capacities as Pennsylvania
State Troopers; and; EAST LAMPETER TOWNSHIP

———————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 04-cv-05695)
District Judge:  The Honorable Paul S. Diamond

———————

ARGUED APRIL 10, 2007

Before: SMITH, NYGAARD, and HANSEN,[*] Circuit Judges.
(Filed May 22, 2008)

———————

J. Dwight Yoder, Esq. (Argued)
Gibbel, Kraybill & Hess
41 East Orange Street
Lancaster, PA 17602

Counsel for Appellants


John G. Knorr, III (Argued)
Office of the Attorney General of Pennsylvania
Department of Justice
15th Floor, Strawberry Square
Harrisburg, PA 17120
Counsel for Appellees

————————————

*Honorable David R. Hansen, Senior Circuit Judge for
the Eighth Circuit Court of Appeals, sitting by designation.

---

OPINION OF THE COURT

---

NYGAARD, Circuit Judge.

Appellants, Tristan Egolf, Benjamin Keely, Jonathan Kohler, David O'Bryant, and Adam Willard claimed that several state and municipal actors violated their First and Fourth Amendment rights by arresting them during a demonstration against the war in Iraq.[1] The District Court granted summary judgment for the police on all claims and denied appellants'

---

[1] Initially, the plaintiffs sued Trooper Linda Gerow, Blaine Hertzog and Wayne Kline, six East Lampeter Township police officers, five unknown state actors and five unknown federal actors, alleging that the police officers acted at the direction of White House personnel. The plaintiffs amended their complaint twice, dismissed three Township officers, added Trooper Adams and the Township as defendants, and withdrew all claims respecting unknown state and federal actors. When Mr. Egolf died on May 7, 2005, the District Court substituted Egolf's parents as plaintiffs. The District Court eventually dismissed the Township police officers and the Township as parties, pursuant to the parties' stipulation.

3

motion for partial summary judgment on the First and Fourth

Amendment claims. We will affirm the District Court's holding

regarding the Trooper's motion for summary judgment on their

qualified immunity claim.[2]

I.

We have plenary review of the District Court's grant of

summary judgment. *181 South Inc. v. Fischer*, 454 F.3d 228,

231, n. 4 (3d Cir. 2006).[3]  For the purpose of our review, we

---

[2.]The District Court also granted summary judgment in favor of the police with regard to the Petitioners' claims that the police violated their First and Fourth Amendment constitutional rights. We do not reach constitutional issues unnecessarily, and in this instance, we hold only that the police are entitled to qualified immunity. *See U.S. v. Otero,* 502 F.3d 331, 334 n. 1 (3d Cir. 2007).

[3.]The District Court exercised jurisdiction over this matter pursuant to 28 U.S.C. §§1331 and 1343. We have jurisdiction

(continued...)

4

will accept the facts as determined by the District Court, construing them in a light most favorable to the party that is claiming a constitutional violation, in this case the protesters. *Gilles v. Davis*, 427 F.3d 197, 203 (3d Cir. 2005).

In the summer of 2004, President Bush was scheduled to make an appearance in East Lampeter, Pennsylvania, as part of his reelection campaign. Between three and four hundred adults and children gathered along the motorcade's expected route. The East Lampeter Township police, with assistance from several Troopers from the Pennsylvania State Police, were dispatched to maintain order.

A group of people opposed to President Bush and the war in Iraq gathered at a spot along the route. One protester, wearing a t-shirt emblazoned with the words, "F--- Texas," carried a

---

[3.](...continued)
over the District Court's final order pursuant to 28 U.S.C. §1291.

5

large sign stating, "Great War, George." Others nearby carried signs declaring, "F--- Texas," "F--- Bush," "Regime Change Begins at Home," "Go Back to Texas," and depicting Bush as the "World's No. 1 Terrorist."

These protesters planned to demonstrate their opposition to the war in Iraq by recreating a notorious image from the prisoner abuse scandal at Abu Ghraib.[4] When they believed the presidential motorcade was near,[5] seven male protesters quickly removed their shirts, pants, socks and shoes. Wearing only thong underwear, they turned their buttocks toward the road. Five men got on their hands and knees, and the other two men

---

[4] In the widely publicized image, several naked prisoners at Abu Ghraib are piled on top of one another, with their backs facing the camera. Two U.S. service members, Staff Sergeant Charles Graner and Private First Class Lynndie England, stand behind the men, smiling and giving a "thumbs-up" signal.

[5] In fact, President Bush did not pass through the area until 15-20 minutes later.

climbed on top of them to form a pyramid. An associate of the protesters, Kara Dimitris, stood behind the pyramid, gave a "thumbs up" sign with one hand, and in the other, held up the "Great War, George" sign. Another associate of the protester group, Dan Rhineer, filmed the event.

Those that formed the pyramid remained passive and silent. Rhineer's video recording evinces sounds of cheering and some laughter in the surrounding crowd. Other people in the surrounding crowd objected to the protest and they can be heard demanding that the group put their clothes back on. Rhineer defended the men exclaiming: "This happened! Children need to know about this!"

Pennsylvania State Police and officers from East Lampeter Township were standing between the crowd and the road maintaining order in anticipation of the Presidential motorcade. At least one Pennsylvania State Trooper was

7

standing in front of the protesters as they undressed and formed the pyramid. The video recording of the event shows that while the police closest to the protesters saw the event, they did nothing to immediately respond. Some bystanders began loudly imploring to the officers to respond.

Trooper Blaine Hertzog, monitoring the crowd near the protesters, became concerned as yelling among the people grew louder. He testified that he waved to Township Officer Christopher Jones. Hertzog and Jones asked one another whether the demonstration was illegal. After Jones signaled other officers for assistance, Troopers Linda Gerow, Marian Adams, and Wayne Kline headed to the scene. At that point, Trooper Hertzog stated that he saw the protesters stacked upon each other in a pyramid shape, and he saw their "buttocks and the thongs."

8

Trooper Hertzog testified during a deposition that he and Officer Jones did not, on their own, take enforcement action relative to the protesters, nor had they concluded one way or the other that any illegal activity was occurring. They moved in only when a Trooper who was arriving at the scene on foot made the command to arrest the protesters. The immediate concern noted by Trooper Hertzog in those moments was the increasing tension in the crowd that he was monitoring.

When Trooper Gerow came upon the scene, the pyramid had stood for less than two minutes. Upon arriving, she saw men clad in tight thongs "mooning" the crowd and she immediately pulled one of the men off the pyramid.[6] The other

[6.] At her deposition, Trooper Gerow explained, "It was a public place. There were children everywhere. . . . There was a group of men mooning, you know, the general public for no reason, and it was obviously alarming and offensive to those around them. It was to me. These are grown men that had tight little thongs on in a public place where you would expect people

(continued...)

9

officers then arrested Egolf, Keely, Kohler, O'Bryant, Russell Willard, and Adam Willard.

As the police began to pull the men out of their formation, surrounding associates of the protesters responded that the men were not doing anything illegal. Nonetheless, the protesters complied with the direction of the officers who took them away from the scene. The police did not arrest one member of the pyramid who had quickly put on his pants and shirt.

The Township police then took the protesters to the police station and charged them with disorderly conduct. The police held the men for approximately two hours and then released them. Three months later, the Lancaster County District Attorney announced that he had withdrawn the disorderly

[6](...continued)
to be clothed...You know, its not something I really had to think about."

conduct charges because he doubted that the Commonwealth could successfully prosecute the matter.[7]

Egolf, Keely, Kohler, O'Bryant and Adam Willard filed suit under 42 U.S.C. §1983, alleging that their arrests violated the First and Fourth Amendments. The police moved for summary judgment. Appellants filed a motion for partial summary judgment.

Addressing the protesters' claimed violations of their constitutional rights, the District Court noted that the facts of this case present a question not yet addressed by Pennsylvania courts.[8] Relying on our opinion in *Radich*, the District Court

---

[7.]The police did not participate in the decision to charge the men, or to withdraw the charges.

[8.]Police charged the protesters with disorderly conduct at the time of the arrest. (18 Pa. C.S. 5503(a)). The District Attorney dropped these charges three months after the arrest. Yet, obviously aware that probable cause need only exist as to *any* offense that could be charged under the circumstances, the

(continued...)

11

held that the ambiguity of whether or not the appellants violated Pennsylvania's Open Lewdness Act was reason enough to give the police probable cause to arrest the protesters. In *Radich*, we held that police officers cannot be expected to accurately predict the court's interpretation of an issue of first impression. Therefore, in some such cases, it is reasonable to find that the police had probable cause. *Radich v. Goode*, 886 F.2d 1391, 1398 (3d Cir. 1989).

Alternately, predicting that Pennsylvania courts would find that the protesters engaged in prohibited lewd conduct, the District Court found that a reasonable officer would have decided that probable cause existed to arrest the protesters.

---

[8.](...continued)
police argued before the District Court that they had probable cause to arrest the protesters under the Pennsylvania lewdness statute. *See Barna v. City of Perth Amboy*, 42 F.3d 809, 819 (3d Cir. 1994).

Upon these bases, the District Court concluded that the police did not violate the Fourth Amendment rights of the protesters.

The District Court also concluded that the police did not violate the First Amendment. As applied in this instance, the court found that the police's arrest of the protesters under the lewdness statute was a permissible restriction on expressive conduct using the analysis detailed in *United States v. O'Brien*, 391 U.S. 367 (1968).

Finally, the District Court concluded that, even if the police violated the constitutional rights of the protesters under either the First or Fourth Amendments, the police had qualified immunity from suit. The court granted immunity on the basis that the constitutional rights were not "clearly established" in the circumstances of this case. This appeal followed.

We have a longstanding practice of avoiding constitutional questions in cases where we can reach a decision

13

upon other grounds. *See U.S. v. Otero,* 502 F.3d 331, 334 n. 1 (3d Cir. 2007). In this instance, we agree with the District Court that, regardless of whether the police violated the protesters' First and Fourth Amendment rights, these rights were not "clearly established" in this circumstance. On this basis, and for the reasons set out below, we will affirm the District Court's grant of qualified immunity to the police but we will not address the First and Fourth Amendment questions raised in this case.

## II.

The assessment of qualified immunity normally involves two steps. In the usual case, we must assess whether the facts alleged, viewed in the light most favorable to the party asserting the injury, demonstrate that the state actor's conduct violated a constitutional right. Where a constitutional violation exists, we then move to a second tier of analysis to determine whether the violated right was "clearly established." *Saucier v. Katz*, 533

14

U.S. 194, 200 (2001); *Gilles,* 427 F.3d at 203.  We find in this case an exception to this generally mandated analytic framework.[9]

A.

Although *Saucier* requires that courts engage a two-tiered analysis that first examines whether a constitutional violation exists, we must approach this framework in a manner that is consistent with its purpose.  As *Saucier* clearly explains, the underlying principle of first requiring constitutional analysis is to advance the elaboration of the law to give state actors better guidance on the parameters of constitutional violations.

---

[9.]The majority does not hold the view that *Saucier* abrogated the long-standing maxim that courts will not reach constitutional issues unnecessarily. *Saucier*, 533 U.S. at 207 ("[T]he [sequential] procedure permits courts *in appropriate cases* to elaborate the constitutional right with greater degrees of specificity."(emphasis added)).

15

*Saucier*, 533 U.S. at 200; *Gilles* 427 F.3d at 203. This principle guides our resolution of this case.

Although the District Court thoroughly reviewed the First and Fourth Amendment claims, it found that the state law questions underlying the constitutional issues were ones of first impression for the state courts.[10] Accordingly, in both claims of

---

[10.]Pennsylvania law states that "[a] person commits a misdemeanor of the third degree if he does any lewd act which he knows is likely to be observed by others who would be affronted or alarmed." 18 Pa.C.S.A. § 5901. The Pennsylvania Supreme Court has favorably referenced a comment to the Model Penal Code that states: "The prohibited [lewd] conduct amounts to gross flouting of community standards *in respect to sexuality or nudity in public*." (emphasis added) *Heinbaugh*, 354 A.2d at 247, citing Model Penal Code Comment at p. 81. Nudity or overt sexually offensive displays are therefore essential to "lewd" conduct. *Id.* (citing *Winters v. New York*, 333 U.S. 507, 515 (1948). We presume then, for purposes of this analysis that the elements of a violation of Pennsylvania's lewdness statute to be: nudity and/or sexually explicit displays; in circumstances likely to be observed by the public; that causes offense or alarm due to its gross departure from accepted community standards. *Id., See Commonwealth v. Williams*, 574 A.2d 1161, 1163 (1990). The essence of the inquiry here is

(continued...)

16

constitutional violations the District Court's analysis relied upon

its prediction of how the Pennsylvania courts would rule if this

case was before them.[11]  We find such cases to be exceptions to

the constitutional analysis requirement of *Saucier,* because the

purpose of *Saucier* would be undermined.

In concluding that we will not analyze the First or Fourth

Amendment issues in this case, we find a decision of the Court

of Appeals for the Second Circuit to be persuasive in reasoning

that the underlying principle of law elaboration is not

[10.](...continued)
whether exposure of one's buttocks constitutes "nudity" which, to date, has been defined under the statute as either fully unclothed or exposing genitalia.

[11.]The legal definition of nudity is in this case the essence of a constitutional analysis of the Fourth Amendment under qualified immunity.  By extension, this definition is also critical to the District Court's determination of whether the state had a legitimate interest in regulating nudity under an *O'Brien* First Amendment review. See *U.S. v. O'Brien*, 391 U.S. 367 (1968).

meaningfully advanced in situations, such as this, when the definition of constitutional rights depends on a federal court's uncertain assumptions about state law. *Ehrlich v. Town of Glastonbury,* 348 F.3d 48, 55-58 (2d Cir. 2003); *See also Robinette v. Jones,* 476 F.3d 585, 592 n.8 (8th Cir. 2007). We agree that, in cases such as this, federal courts do a disservice to state actors who would be induced to rely on a ruling that might change altogether upon subsequent review by the state court. *Ehrlich,* 348 F.3d at 58. Our position is bolstered by the fact that, even if we were to find constitutional rights violations we are convinced that such rights were not clearly established.[12]

B.

---

[12.]We recognize the District Court's alternate rationale for finding probable cause was based upon the ambiguity that, we agree, exists. However, this ambiguity does not provide us with a compelling rationale to rule on a constitutional issue where alternate grounds for a decision exist.

18

The second prong of the qualified immunity analysis is focused upon "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202; *Gilles,* 427 F.3d at 203. Qualified immunity turns on the "objective legal reasonableness of the action . . . assessed in light of the legal rules that were clearly established at the time." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). Courts have defined the term "clearly established" to mean "some but not precise factual correspondence between relevant precedents and the conduct at issue." *McLaughlin v. Watson*, 271 F.3d 566, 571 (3d Cir. 2001). It is now axiomatic that our qualified immunity analysis "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Gilles*, 427 F.3d at 203.

19

Here, even if we assume that the police violated the protesters' rights under the First and Fourth Amendments by arresting them, we are mindful that the circumstances were quite unusual. There is no dispute that events relating to the group's undressing and posing developed quickly. At the same time, other members of the crowd were loudly making objections against the protesters. The escalation of tension at the scene was sudden, surprising and intense. All evidence shows that it was this rising disturbance of the crowd that captured the attention and concern of the officers who responded.

Furthermore, all of this occurred at a time that the officers were keenly aware of their immediate responsibilities to keep the crowd under control in anticipation of a passing Presidential motorcade. Even though the protection of the President was within the ambit of other officials, maintaining order within the crowd alongside the motorcade route (which

20

was the police's responsibility) was undeniably an important component of the overall security for the President on that day. The officers did not have the luxury of ignoring the brewing anger. We recognize that a sudden disruption in a crowd does not, of itself, justify unreasonable arrests. It does, however, compel us to appreciate the pressures that burdened the judgments of the officers on that day and the emotionally-charged prism through which the bystanders appeared to view the disturbance. *Saucier,* 533 U.S. at 204-5; *Gilles*, 427 F.3d at 203.

Adding to the confusion is the fact that the protesters intentionally chose to simulate the abhorrent image of Abu Ghraib: an image that was inherently offensive from a number of perspectives precisely because it showed naked prisoners who were forced to pose in a sexually humiliating manner. The protesters admitted that they intentionally clothed themselves in

21

a manner that closely simulated the nudity of the original photograph. Therefore, even the protesters believed that they were brushing closely to the boundaries of a publically indecent act. Moreover, the choice that the protesters made to portray this particular image generates a question that would have been difficult to assess on the scene: whether the depiction of an inherently sexually offensive image is any less shocking simply because people recreate it as a protest. While we can rationalize from our vantage point that the scene created by the protesters might be distinguishable from the original image, the objective on-the-scene perspective required of us in this qualified immunity review inexorably mires such contrasts. For these reasons, we conclude that there is ample evidence that this event was precisely the type of scene envisaged in *Saucier*, where an officer in the field must make "split second judgments – in

22

circumstances that are tense, uncertain and rapidly evolving."
*Id.*

This situation demanded an instantaneous, finely calibrated judgment in response to a disturbance that arose amid circumstances that were undeniably unique, surprising, confusing and charged. It was plainly one in which the parameters of probable cause were confusing and the boundaries of free speech were quite muddled. *McLaughlin*, 271 F.3d at 571. As a result, we cannot characterize the officers' actions, for purposes of qualified immunity, as either incompetent or as willful violations of the law.

For these reasons, we conclude that, even if the officers' decision to arrest the protesters was mistaken, it was a reasonable mistake in the context in which it occurred. We do not find error in the District Court's grant of qualified immunity to the police.

23

III.

For the reasons stated above we affirm the district court's grant of summary judgment in favor of the police on the issue of qualified immunity.

*Egolf v. Witmer*, No. 06-2193.

SMITH, Circuit Judge, concurring.

Like the majority, I conclude that we should affirm the District Court's grant of summary judgment in favor of the State Troopers. I write separately, however, because I believe the constraints of *Saucier v. Katz*, 533 U.S. 194 (2001), compel a different analytical path.[13]

---

[13.] I fully recognize that a number of circuits have declined to follow *Saucier* and that there have been doubts expressed, by some of the courts of appeals and the Supreme Court alike, regarding the wisdom of *Saucier*'s mandatory two-step approach to resolving questions of qualified immunity. *See, e.g.*, *Buchanan v. Maine*, 469 F.3d 158, 168 (1st Cir. 2006)
(continued...)

24

[13.](...continued)

("We do not think the law elaboration purpose will be well served here, where the Fourth Amendment inquiry involves a reasonableness question which is highly idiosyncratic and heavily dependent on the facts. . . . Given the complexity of the matter, and since it is perfectly clear that the officers are entitled to immunity, we turn to the second and third prongs."); *Robinette v. Jones*, 476 F.3d 585, 592 n.8 (8th Cir. 2007) ("*Saucier* requires a full analysis of the first prong of a qualified immunity analysis because it 'permits courts in appropriate cases to elaborate the constitutional right with greater degrees of specificity.' However, the 'law's elaboration from case to case' . . . would be ill served by a ruling here, where the parties have provided very few facts to define and limit any holding on the reasonableness of the execution of the arrest warrant.") (internal citations omitted); *McClish v. Nugent*, 483 F.3d 1231, 1253 n.1 (11th Cir. 2007) (Anderson, J., concurring specially) ("Unfortunately, in this case, because the defendants prevailed on the clearly established prong, the *Saucier* rule not only requires a constitutional holding that would be unnecessary otherwise; it also operates to insulate from further appellate review an erroneous constitutional ruling that will guide the conduct of police officers in three states. . . . Also, under the *Saucier* approach, a court is handicapped in addressing the constitutional issue because at least one party often has little incentive to litigate the issue vigorously, especially when it is apparent that the law is not clearly established, as in this case."); *Lyons v. City of Xenia*, 417 F.3d 565, 581–84 (6th Cir. 2005) (Sutton, J., with whom Gibbons, J., joins, concurring) ("I cannot
(continued...)

The majority acknowledges that "*Saucier* requires that courts engage a two-tiered analysis that first examines whether a constitutional violation exists." Yet, the majority declines to follow this mandate because it finds that doing so in this case

[13.](...continued)
resist adding still another separate writing in this case that questions the rigidity of [the *Saucier*] requirement. While I see the virtue in telling lower courts that they should generally answer the constitutional question before the clearly established question, I wonder whether it makes sense to mandate that they do so in all cases, no matter the costs, no matter the ease with which the second question might be answered."). Further, twenty-eight states and Puerto Rico have recently urged, albeit unsuccessfully, the Supreme Court in an amicus brief to reconsider its mandatory *Saucier* approach to qualified immunity. *See* Brief for Twenty-Eight States and Puerto Rico as Amici Curiae in Support of Petitioner, Scott v. Harris, 127 S.Ct. 1769 (2007) (No. 05-1631).

Most recently, the Supreme Court granted certiorari in the case of *Callahan v. Millard County*, 494 F.3d 891 (10th Cir. 2007), directing the parties to brief and argue "[w]hether the Court's decision in Saucier v. Katz, 533 U.S. 194 (2001) should be overruled." *Pearson v. Callahan*, --- S.Ct. ----, 2008 WL 754340, 76 USLW 3316, 76 USLW 3508, 76 USLW 3510 (U.S. Mar 24, 2008) (No. 07-751).

26

would not accomplish *Saucier*'s purpose. It may be that the Supreme Court will return to its pre-*Saucier* jurisprudence, where determining first whether the plaintiff has alleged a deprivation of a constitutional right is considered only the "better approach." *See County of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998); *see also Siegert v. Gilley*, 500 U.S. 226 (1991) (clarifying the analytical structure under which a claim of qualified immunity should be addressed). For now, however, I regard the *Saucier* rule as mandatory and do not believe that inferior courts are free to depart from it. In *Scott v. Harris*, 127 S.Ct. 1769 (2007), the Court explicitly stated:

> In resolving questions of qualified immunity, courts are required to resolve a "threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officers conduct violated a constitutional right? *This must be the initial inquiry.*" *If, and only if, the court finds a violation of a constitutional right*, "the next, sequential step is to

27

> ask whether the right was clearly established . . .
> in light of the specific context of the case."

*Scott*, 127 S.Ct. at 1774 (emphasis added) (internal citations omitted). *See also Bunting v. Mellen*, 541 U.S. 1019 (2004) (Scalia, J. dissenting from the denial of certiorari) ("[S]ome courts [have] conclude[d] (mistakenly) that the constitutional-question-first rule is customary, not mandatory."). Perhaps in circumstances where the underlying principle of law elaboration is not meaningfully advanced or where a court would be required to address unsettled questions of state law, the jurisprudential policy of avoiding unnecessary adjudication of constitutional issues is actually the better approach.[14] But until

---

[14.] Along with the majority, I do not hold the view that *Saucier* intended to disavow the prudential rule of avoiding constitutional questions. Rather, the *Saucier* Court recognized a competing goal—the development of substantive constitutional protections in the constitutional tort context that might otherwise go undeveloped if lower courts routinely disposed of § 1983 cases without reaching the merits. Indeed, a right can never be "clearly established" if the right has never

(continued...)

28

<sup>14.</sup>(...continued)
been recognized at all. The Supreme Court "has never treated avoidance as an absolute; it is a policy aimed at specific objectives, and these nearly always compete with other goals." Michael L. Wells, *The "Order-of-Battle" in Constitutional Litigation*, 60 SMU L. Rev. 1539, 1543 (2007). While I do not express a view as to whether the Court's articulated goal counsels against applying the "long-standing maxim," adherence to *Saucier*'s "order of battle" does not require one to accept that *Saucier* abrogated the prudential rule.

In this vein, the majority's citation of *Saucier*, that, "the [sequential] procedure permits courts *in appropriate cases* to elaborate the constitutional right with greater degrees of specificity" must be read within the context of the entirety of the opinion, and the Court's subsequent jurisprudence. (Majority Op. at 15 n.9) (quoting *Saucier*, 533 U.S. at 207) (emphasis added). At the outset of the *Saucier* opinion, the Court explains that *in furtherance of determining whether a constitutional right was violated*, there may be cases in which it is appropriate, and indeed necessary, to elaborate on the constitutional right with respect to the new set of facts before the court, so that the right may be clearly established in later cases. *See Saucier*, 533 U.S. at 201. Specifically, the Court stated that

> In the course of determining whether a constitutional right was violated on the premises alleged, a court might find it necessary to set forth principles which will become the basis for a holding that a right is clearly established. This is

(continued...)

29

the Supreme Court crafts an exception to the *Saucier* rule, it is my view that we are not free to make that policy choice, however salutary. *See, e.g.*, *Doe v. Delie*, 257 F.3d 309, 315 n.4 (3d Cir. 2001) ("While there may be pragmatic considerations favoring [the] qualification of the Supreme Court's unqualified language, the Court has not yet suggested any basis for departing from the rule . . . ."). I believe, therefore, that the

[14.](...continued)
the process for the law's elaboration from case to case, and it is one reason for our insisting upon turning to the existence or nonexistence of a constitutional right as the first inquiry. The law might be deprived of this explanation were a court simply to skip ahead to the question whether the law clearly established that the officer's conduct was unlawful in the circumstances of the case.

*Id.* Further, the majority cannot possibly be arguing that its citation to *Saucier* supports a view that the two-step approach is merely permissive, i.e., should *in actuality* only be employed "in appropriate cases." Indeed, the Court's subsequent jurisprudence reiterating its mandatory nature, as well as the dissents filed in those opinions, compel a contrary interpretation.

proper analytical course in this case is first to consider whether the Troopers violated the Constitution.

Because I conclude that, on the facts alleged, the Troopers' conduct did not violate the Plaintiffs' constitutional rights, my analytical course would not require that we reach the question of qualified immunity.

## I.

Plaintiffs allege that the Troopers violated their Fourth Amendment rights by arresting them without probable cause. They argue that their conduct did not present the Troopers with probable cause to arrest because they were engaging in protected First Amendment activity and, as such, the expressive nature of their conduct should have been taken into account by the Troopers in making their probable cause determination at the scene.

Probable cause to arrest exists when "the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Orsatti v. New Jersey State Police*, 71 F.3d 480, 482 (3d Cir. 1995). "To determine whether an arrest is valid, we look to the law of the state where the arrest took place." *Wright v. City of Philadelphia*, 409 F.3d 595, 601 (3d Cir. 2005) (citations omitted). The question of "probable cause in a section 1983 damage suit is one for the jury." *Montgomery v. De Simone*, 159 F.3d 120, 124 (3d Cir. 1998). However, a district court may conclude "that probable cause did exist as a matter of law if the evidence, viewed most favorably to Plaintiff, reasonably would not support a contrary factual finding," and may grant summary judgment accordingly. *Sherwood v. Mulvihill*, 113 F.3d 396, 401 (3d Cir. 1997).

The Troopers contend that they had probable cause to arrest the Plaintiffs because their conduct violated Pennsylvania's open lewdness statute, which provides that "[a] person commits a misdemeanor of the third degree if he does any lewd act which he knows is likely to be observed by others who would be affronted or alarmed." 18 Pa.C.S.A. § 5901. The relevant inquiry, then, is whether it was objectively reasonable for the Troopers to conclude that they had probable cause to arrest the Plaintiffs based on "the facts available to the officers at the moment of arrest." *Barna v. City of Perth Amboy*, 42 F.3d 809, 819 (3d Cir. 1994) (quotation omitted).[15]

[15.] As stated, Plaintiffs contend that their First and Fourth Amendment rights are inextricably linked—that the Troopers lacked probable cause to arrest them because their conduct was protected under the First Amendment. Indeed, when pure speech is at issue this Court has stated that

[T]he statute must "be carefully drawn or authoritatively construed to punish only unprotected speech and not be

(continued...)

33

susceptible of application to protected expression." *Johnson v. Campbell*, 332 F.3d 199, 211 (3d Cir. 2003) (quoting *Gooding v. Wilson*, 405 U.S. 518, 522, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972)); *Commonwealth v. Mastrangelo*, 489 Pa. 254, 414 A.2d 54, 58 (1980) ("disorderly conduct statute may not be used to punish anyone exercising a protected First Amendment right"). Speech that does not receive First Amendment protection, in turn, "include[s] the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words[.]" *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942).

*Gilles v. Davis*, 427 F.3d 197, 204 (3d Cir. 2005). The interplay of Fourth and First Amendment rights with respect to expressive conduct, as opposed to speech, does not give rise to clear rules of application. Here, expressive conduct is unquestionably at issue, as I discuss later. Yet, it is also clear that the open lewdness statute prohibits conduct that is *inherently* unrelated to the political message that the Plaintiffs attempted to convey. This reality is important, especially in a case such as this in which police officers are required to make an on-the-spot probable cause determination. Because the Plaintiffs do not facially attack the statute as overbroad or void for vagueness, and because I conclude that the statute was constitutionally applied to the Plaintiffs and that probable cause for arrest existed, I need not further consider the extent of the relationship.

(continued...)

A review of the record, particularly the videos of the event, reveals that a crowd had gathered along the side of a small commercial highway. Kara Dimitris appeared in the videos wearing a green shirt, a hat and yellow gloves and carrying a sign saying, "Great War, George." When she shouted, "Shirts off," the Plaintiffs removed their clothes until they were wearing only thong underwear. The District Court observed that "the thin material of their tight-fitting thongs unmistakably displayed the contours and movement of their genitals. . . . From the rear, the thongs displayed the entire surface of their buttocks; from various angles, Plaintiffs appeared to be entirely naked." *Egolf v. Witmer*, 421 F.Supp.2d 858, 864 (E.D.Pa. 2006). An examination of the record reveals

_____

[15.](...continued)

35

that the contours and movement of the Plaintiffs' genitals could be seen by bystanders while the Plaintiffs arranged themselves into the pyramid, but not while they were in the pyramid formation. And the thongs revealed the entire surface of each Plaintiff's buttock. The Plaintiffs did not disrobe with great speed, but then quickly formed a human pyramid. The videos show young children, including toddlers, in the immediate area. Several members of the crowd quickly became agitated, shouting at the Plaintiffs and at Dan Rhineer, the cameraman. Several women observed that their children were present and upbraided the protesters. Others made unfavorable comments about their taste and respect for authority. Rhineer attempted to explain the protest, stating that "This has happened before," and that, "American soldiers did this [to prisoners]." When Rhineer remarked that children needed to learn about the Abu Ghraib

torture, one concerned onlooker responded, "Not naked they

don't."

Pennsylvania case law interpreting what constitutes a

"lewd act" has consistently maintained that the essence of a

"lewd act" is "sexuality or nudity in public," without much

elaboration. *See Commonwealth v. Fenton*, 750 A.2d 863, 866

(Pa.Super. 2000) (citing *Commonwealth v. Williams*, 574 A.2d

1161 (Pa.Super. 1990)). In the case of *Commonwealth v.*

*Heinbaugh*, 354 A.2d 244, 247 (Pa. 1976), the Pennsylvania

Supreme Court concluded that § 5901 "must be read as restating

the established common law standard which has long existed in

this Commonwealth." The Court explained:

> Open lewdness was an indictable offense at
> common law. It was defined as an act of gross and
> open indecency which tends to corrupt the morals
> of the community. *Winters v. New York*, 333 U.S.
> 507, 515, 68 S.Ct. 665, 92 L.Ed. 840, 849 (1948);
> *Commonwealth v. Sharpless*, 2 Serg. & R. 91, 100
> (1815); IV Blackstone Commentaries 64 n.38
> (W. Lewis ed. 1898); 53 C.J.S. Lewdness, p. 4

37

(1948). While the language of the challenged Pennsylvania lewdness statute differs in some respects from this common law definition, there is no difference in meaning. The statute in question is a verbatim adoption of the lewdness provision of the Model Penal Code, ALI, Model Penal Code, Proposed Official Draft 251.1. The comment to that section makes it clear that the drafters intended to codify the pre-existing common law: "Lewd or indecent behavior is punishable in all jurisdictions. The prohibited conduct amounts to gross flouting of community standards in respect to sexuality or nudity in public." ALI, Model Penal Code, Tentative Draft No. 13 §§ 213.4 & 251.1 Comment at p. 81.

*Heinbaugh*, 354 A.2d at 247. Since *Heinbaugh*, it appears that

"[a]ll of the reported Pennsylvania cases on open lewdness

involved public masturbation or public displays of genitalia."

*Commonwealth v. Williams*, 574 A.2d 1161, 1163 (Pa.Super.

1990).[16]    Nevertheless, "lewd" acts remain interpreted as

---

[16.]    The *Williams* Court looked to a summary of Pennsylvania's case law on open lewdness as laid out by a majority of the Supreme Court of Pennsylvania:

All prosecutions have been based . . . on a "gross

(continued...)

38

flouting of community standards in respect to sexuality or nudity in public." *See Commonwealth v. Heinbaugh*, supra (masturbation in public); *Commonwealth v. Davidson*, 220 Pa.Super. 451, 289 A.2d 250 (1972) allocatur refused, 221 Pa.Super. xlix (naked motorist stopped a young lady to ask directions); *Commonwealth v. Falcone*, 202 Pa.Super. 474, 198 A.2d 421 (1964) (masturbation in a public cemetery); *Commonwealth v. Warner*, 51 Pa.D.&C.2d 63 (C.P. Centre Cnty. 1971) (defendant disrobed in public, made uninvited visits to private homes, and entered a public pizza parlor); *Commonwealth v. Anzulewicz*, 42 Pa.D.&C.2d 484 (Q.S. Mont. Cnty. 1967) (display of genitalia in private dwelling but in front of window where a neighboring family "in the reasonable use of (their) house" could not help but observe defendant's activities); *Commonwealth v. Helms*, 38 Pa.D. & C.2d 496 (Q.S. York Cnty.), *aff'd per curiam*, 206 Pa.Super. 743, 213 A.2d 389 (1966) (no offense made out where defendant's nudity was in a private trailer and prosecution witness had to observe through small, louvered window); *Commonwealth v. Alessi*, 29 Erie 172 (Q.S. 1947) (masturbation in a private home but before large window facing public street).

(continued...)

"sexuality or nudity in public." *Commonwealth v. Tiffany*, 926

A.2d 503, 510–11 (Pa.Super. 2007) (citing *Commonwealth v.*

*Fenton*, 750 A.2d 863, 866 (Pa.Super. 2000)). While *Tiffany*

dealt with the conviction of a man who swam nude in a public

place with minors, the court, when discussing the § 5901

conviction, explained only that "Section 5901 pertains to

conduct that: '1) involves public nudity or public sexuality, and

2) represents such a gross departure from accepted community

standards as to rise to the level of criminal liability.'" *Id.* (citing

*Williams*, 574 A.2d at 1163).

What the Pennsylvania cases make clear, then, is that

either public nudity or public sexuality must have occurred to

establish a violation of § 5901, not necessarily both. *See, e.g.*,

*Commonwealth v. Polomchak*, 10 Pa.D. & C.4th 395, 397 (C.P.

---

[16.](...continued)
*Williams*, 574 A.2d at 1163 (quoting *Commonwealth v. Allsup*, 392 A.2d 1309, 1312 (1978)).

Bucks Co. 1991), *aff'd*, 421 Pa.Super. 635, 612 A.2d 535 (1992) (finding defendant guilty of violating § 5901 where he sat at a bar with his hand in his lap underneath his coat and masturbated or feigned masturbation, noting that "actual nudity is not a required element of the crime of open lewdness"); *Williams*, 547 A.2d 1161 (holding that a public appearance in a t-shirt and "tight-fitting briefs" is not a lewd act).

The Troopers do not argue, nor could they, that the Plaintiffs' conduct constituted public sexuality. The question, then, is whether the Plaintiffs' conduct gave the Troopers probable cause to arrest them for open lewdness in light of the fact that, to date, the reported § 5901 cases involving nudity include only display of genitalia.

My read of Pennsylvania law is that it contemplates a fairly broad definition of nudity. The statutory definition of "nudity" in other Pennsylvania statutes suggests that exposure

41

of the buttocks, the conduct Plaintiffs engaged in here, falls within § 5901's ambit. For example, the Pennsylvania statute regulating distribution of obscene materials defines "nudity" as the "showing of the human male or female genitals, pubic area, or *buttocks with less than a fully opaque covering*, or the showing of the female breast with less than a fully opaque covering of any portion thereof below the top of the nipple, or the depiction of covered male genitals in a discernibly turgid state." 18 Pa.C.S. § 5903 (emphasis added). In addition, Pennsylvania's statute prohibiting "invasion of privacy" defines "[f]ull or partial nudity," as, "[d]isplay of all or any part of the human genitals or pubic area *or buttocks . . . with less than a fully opaque covering*." 18 Pa.C.S.A. § 7507.1 (emphasis added). Therefore, if Pennsylvania courts import into § 5901 the statutory definitions of nudity from other sections of the

42

Pennsylvania Crimes Code, it is reasonable to conclude that exposure of the buttocks qualifies as "nudity."

One might argue that a Pennsylvania court following *Williams* would hold that the Plaintiffs' actions fall within the *Williams* Court's holding that "walking about in underwear may be a foolish act," but it is not an illegal one. *Williams*, 574 A.2d at 1163. In *Williams*, the court noted that the Commonwealth established only that appellant walked through a parking lot in a T-shirt and underwear. *Id.* The court then explained that the "[a]ppellant's behavior cannot reasonably be found to fall within the purview of [§ 5901]. A person who is wearing a T-shirt and underwear is not appearing in the nude, and walking about in underwear may be a foolish act but is not a sexual act." *Id.*

The case at bar offers clear distinctions from the facts in *Williams*. As already stated, the statutory definition of "nudity" in other Pennsylvania statutes encompasses exposure of the

43

buttocks—activity the Plaintiffs here unmistakably engaged in. Thus, it is reasonable to say that they were "appearing in the nude" under Pennsylvania law.  Beyond that, one need hardly resort to an expert on fashion to note the obvious distinction between wearing "elastic tight-fitting briefs," *Williams*, 574 A.2d at 1162, and tight-fitting thong underwear that unmistakably displays the contours and movement of an individual's genitals, not to mention the entirety of that individual's buttocks.[17]

---

[17.]    The District Court noted that state laws similar to § 5901 have been construed similarly:

> For instance, the Massachusetts Supreme Judicial Court recently held that a man violated Massachusetts' open lewdness statute when, clad in thong underwear, he lowered his pants and exposed his buttocks to four teenagers.  *See Commonwealth v. Quinn*, 439 Mass. 492, 789 N.E.2d 138 (2003).  Quinn contended that he did not violate the statute because he had kept his genitals covered.  *Id.* at 493, 789 N.E.2d 138.
>
> (continued...)

A review of Pennsylvania law demonstrates that the Troopers reasonably concluded that they had probable cause to arrest Plaintiffs on violations of the open lewdness statute when the Plaintiffs' appeared at a public gathering in tight-fitting thongs and beared their buttocks. Where the state of the law is uncertain, this Court has refused to "impose upon a police officer [] the duty to correctly predict how a court will answer [an] unresolved and complex legal issue." *Radich v. Goode*, 886

[17.](...continued)
Like § 5901, the Massachusetts statute included no definition of "lewdness," and derived from the common law. *Id.* at 493–95, 789 N.E.2d 138. The *Quinn* Court reviewed analogous case law from Florida, Michigan, Minnesota, Nevada, Vermont, Virginia, and West Virginia, and found that none of those decisions "cabin[ed] the offensive conduct to the intentional exposure of genitals." *Id.* Accordingly, the Supreme Judicial Court held that Quinn's deliberate exposure of his buttocks was a "lewd" act under Massachusetts law.

*Egolf*, 421 F.Supp.2d at 865–66.

45

F.2d 1391, 1398 (3d Cir. 1989). Further, it was reasonable for the Troopers to presume that actual exposure of the genitals was not required in order to violate § 5901, as a separate statute prohibits such conduct. *See* 18 Pa.C.S. § 3127 ("A person commits indecent exposure if that person exposes his or her genitals in any public place or in any place where there are present other persons under circumstances in which he or she knows or should know that this conduct is likely to offend, affront or alarm."); *see also Commonwealth v. Polomchak*, 10 Pa. D. & C. 4th 395, 397 (C.P. Bucks Co. 1991) ("[A]ctual nudity is not a required element of the crime of open lewdness.").

Given the uncertainty in the application of Pennsylvania law to the facts before us, we conclude that "[p]robable cause exist[ed] [because] the facts and circumstances are sufficient to warrant a prudent man in believing that the [Plaintiffs] had

46

committed or [were] committing an offense." *Radich*, 886 F.2d at 1395 (internal quotations omitted) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). Thus, the Plaintiffs have not established that their Fourth Amendment rights were violated, *i.e.*, that they suffered a constitutional deprivation under § 1983.

## II.

The Plaintiffs argue that the Troopers violated their First Amendment rights by interfering with their protest. That would require a court considering the initial *Saucier* question to decide whether the Plaintiffs' formation of the pyramid while wearing only thong underwear constituted expressive conduct, permitting them to invoke the First Amendment. *See Texas v. Johnson*, 491 U.S. 397, 403 (1989). If that court—or this panel—concluded that the conduct was expressive, its next determination would be whether the State's regulation is related to the suppression of free expression, *i.e.*, whether the statute is content-neutral or

47

content-based. *See id.*; *City of Renton v. Playtime Theatres*, *Inc.*, 475 U.S. 41, 48 (1986) (explaining that "'content-neutral' speech regulations as those that 'are justified without reference to the content of the regulated speech'" (citations omitted)). And if the court concluded that the State's regulation is not related to expression, then the less stringent standard announced in *United States v. O'Brien*, 391 U.S. 367 (1968), would control. *Johnson*, 491 U.S. at 403. A contrary conclusion would place the State's regulation outside of the *O'Brien* test. *Id.*

"In deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play," the relevant inquiry is whether "'[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it.'" *Johnson*, 491 U.S. at 404 (quoting *Spence v. Washington*, 418 U.S. 405, 409–12 (1974)).

48

In reaching the constitutional claim, I am convinced that the Plaintiffs intended to convey a particularized message when they stripped down to thongs and formed a pyramid; and indeed, the Troopers do not dispute this. Further, on an appeal from a grant of summary judgment, it must be assumed that "the likelihood was great that the message would be understood by those who viewed it." *Spence*, 418 U.S. at 411–12. Therefore, I begin by recognizing that the Plaintiffs engaged in expressive conduct. Accordingly, they are permitted to invoke the First Amendment.

Generally, the Government has a "freer hand" in restricting expressive conduct than restricting writings and speech. *Johnson*, 491 U.S. at 406. The Government may not, however, forbid particular conduct "*because* it has expressive elements." *Id.* Therefore, in order to determine whether the *O'Brien* test applies here, I look to whether Pennsylvania has an

49

interest in regulating the conduct made illegal by § 5901 that is unrelated to the suppression of expression. *See id.* at 407.

What is initially clear about § 5901 is that it was intended to codify the common law. The statute was taken directly from the Model Penal Code and is a descendant of the common law offense of "open and notorious lewdness." 14 West's Pa. Prac., Crim. Offenses & Defenses O240 (5th ed.) (quoting 4 Blackstone, Commentaries *64). *See also Heinbaugh*, 354 A.2d at 247. The purpose of the statute was to prohibit conduct that tended to corrupt the morals of the community. *Heinbaugh*, 354 A.2d at 247 (citing *Winters v. New York*, 333 U.S. 507, 515 (1948)). The Supreme Court has made clear that "[t]he traditional police power of the States is defined as the authority to provide for the public health, safety, and morals." *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 569 (1991). *Accord The License Cases*, 46 U.S. (5 How.) 504, 527–28 (1847); *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996); *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985). I am

50

satisfied that this interest is unrelated to expression, and therefore, that the statute is content-neutral.

The Plaintiffs argue that the statute[18] is a content-based regulation because it is based on "the conduct's communicative impact on others."[19]  As the Troopers point out, however, the Plaintiffs' argument is essentially that

> conduct which 'alarms' or 'affronts' others has a 'communicative impact' by virtue of the very fact that it alarms or affronts.  Offensive conduct is thus *by definition* 'communicative'—because it offends people—and for the government to proscribe such conduct is a 'content-based regulation' because it proscribes the 'message' of, well, offensiveness.

Brief of Defendant-Appellees at 27.  The Plaintiffs' argument is misplaced.  It is a well-settled principle of our nation's First Amendment jurisprudence that *ideas* and *speech* may not be proscribed merely because of the emotive impact they may have

---

[18.] Again, the statute reads: "[a] person commits a misdemeanor of the third degree if he does any lewd act which he knows is likely to be observed by others who would be affronted or alarmed."  18 Pa.C.S.A. § 5901.

[19.] To the extent that the Plaintiffs intend this argument to be a facial challenge to the statute, I do not address it as such because I have concluded that the statute is content-neutral.

on listeners.  *See, e.g.*, *Spence*, 418 U.S. at 412; *Boos v. Barry*, 485 U.S. 312; *R.A.V. v. St. Paul*, 505 U.S. 377 (1992).  Yet, I know of no case in which the Supreme Court has extended this proscription to *conduct* because it elicits an "emotive impact." The Plaintiffs' attempt to elide the distinction between speech and conduct, between ideas and action, must fail.[20]

For example, in *R.A.V. v. St. Paul*, several young men were prosecuted for placing a burning cross in a black neighbor's yard, in violation of a St. Paul, Minnesota, ordinance which prohibited placing "on public or private property a symbol, object, appellation, characterization or graffiti, including, but not limited to, a burning cross or Nazi swastika, which one knows or has reasonable grounds to know arouses anger, alarm or resentment in others on the basis of race, color,

_____

[20.] Importantly, the record makes clear that the Plaintiffs' political expression was not restricted because of the content of the message they conveyed.  *See Texas v. Johnson*, 491 U.S. 397, 412 (1989).  The record shows that the crowd included many other protesters, none of whom were arrested.  Further, the Troopers did not arrest one individual who participated in the pyramid who "quickly dressed."  *Egolf v. Witmer*, 421 F.Supp.2d 858, 862 (E.D.Pa. 2006) (citing Pl. Mem. at 11).

52

creed, religion or gender." 505 U.S. 377, 380 (1992) (citing St. Paul Bias-Motivated Crime Ordinance, St. Paul, Minn., Legis.Code § 292.02 (1990)). The Supreme Court observed that, "[c]ontent-based regulations are presumptively invalid," because "[t]he First Amendment generally prevents government from proscribing speech, or even expressive conduct, because of disapproval of the ideas expressed." *R.A.V.*, 505 U.S. at 382 (internal citations omitted). The Court further elaborated "that nonverbal expressive activity can be banned because of the action it entails, but not because of the ideas." *Id.* at 385. The *R.A.V.* Court made clear that the ordinance was content-based not because it specified that the proscribed conduct had to "arouse[] anger, alarm or resentment," but because it further restricted the impermissible bases of those sentiments to "race, color, creed, religion or gender." *Id.* at 385–88. *R.A.V. v. St. Paul* makes clear that regulations of expressive conduct are content-based only when the regulation is justified by an interest

53

related to an idea or ideas communicated by the conduct, and

not because the conduct elicits a reaction.

Next, the Plaintiffs urge this court to refer to the Supreme

Court's test for regulation of depictions of obscenity as

articulated in *Miller v. California*, 413 U.S. 15 (1973).[21]

However, Plaintiffs overlook the *Miller* Court's express

distinction between depictions and descriptions of lewdness

from lewd public conduct, stating that, "[a]lthough we are not

presented here with the problem of regulating lewd public

conduct itself, the States have greater power to regulate

---

[21.]The *Miller* test is, in full:

> The basic guidelines for the trier of fact must be: (a) whether "the average person, applying contemporary community standards" would find that the work, taken as a whole, appeals to the prurient interest; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

*Miller v. California*, 413 U.S. 15, 23 (1973) (internal citations omitted).

nonverbal, physical conduct than to suppress depictions or descriptions of the same behavior." *Miller*, 413 U.S. at 26 n.8. The Court explicitly noted that the *O'Brien* test was appropriate when dealing with the regulation of conduct embodying "both speech and non-speech elements." *Id.*

Taken together, *R.A.V. v. St. Paul* and *Miller v. California* teach that the *O'Brien* test is appropriate for the regulation of lewd conduct that can be justified without reference to expression of an idea. *See also City of Erie v. Pap's A.M.*, 529 U.S. 277, 289 (2000) ("If the governmental purpose in enacting the regulation is unrelated to the suppression of expression, then the regulation need only satisfy the "less stringent" standard from *O'Brien* for evaluating restrictions on symbolic speech."). Accordingly, application of the *O'Brien* test is appropriate.

The next determination for a court in deciding the constitutional question is whether the statute's application to the Plaintiffs satisfies the four-part test of *O'Brien*. In other words,

55

we must determine if the statute, as applied to the Plaintiffs, is constitutional. I conclude that it is. The *O'Brien* Court held that:

> [A] government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

391 U.S. at 376–77. First, Pennsylvania has the power to regulate public lewdness. The Supreme Court has often upheld similar legislation as it falls within "[t]he traditional police power of the States . . . to provide for the public health, safety, and morals." *Barnes*, 501 U.S. at 569. Second, the statute furthers an important or substantial government purpose. The *Barnes* Court held that a "public indecency statute furthers a substantial government interest in protecting order and morality." *Id*. While the statute at issue is not designated as a "public indecency" statute, it serves the same function of

56

protecting societal order and morality. *See Barnes*, 501 U.S. at 568.

The third *O'Brien* factor—whether the government interest is unrelated to the suppression of free expression—is similar to the question of content-neutrality. *See Pap's A.M.*, 529 U.S. at 296 ("[T]he regulation is still properly evaluated as a content-neutral restriction because the interest in combating the secondary effects associated with those clubs is unrelated to the suppression of the erotic message conveyed by nude dancing."). The Government's interest in discouraging lewdness and protecting children and unsuspecting adults from such acts is unrelated to the suppression of any message intended to be conveyed by the lewd acts. *See Commonwealth v. Allsup*, 392 A.2d 1309, 1311 (Pa. 1978) (explaining that "[t]he gist of the crime is the immediate offensive or frightening impact on members of the public who observe or are likely to observe the defendant's conduct"). As the District Court recognized, the Plaintiffs' argument—that they were

57

"expressing themselves" through their nudity—does not change this conclusion. *See Barnes*, 501 U.S. at 571 ("Public nudity is the evil the State seeks to prevent, whether or not it is combined with expressive activity.").

The fourth *O'Brien* factor inquires whether the restriction on First Amendment freedoms is no greater than necessary to fulfill the Government's interest. 391 U.S. at 377. *See also Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 662 (1994) ("[T]he requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'") (citations omitted). The interest served by § 5901 is to prevent lewd conduct in a setting where it clearly violates community standards. *See Pap's A.M.*, 529 U.S. at 296. Plaintiffs do not propose a less restrictive means of achieving this end than the approach employed in § 5901, nor do I find it easy to posit one. Furthermore, because this is a content-neutral restriction, the

58

least restrictive means analysis is not required.  *See Pap's A.M.*, 529 U.S. at 301–02.

Because the State applied a content-neutral law in a constitutional manner to the Plaintiffs, and because I have already determined that the Troopers had probable cause to arrest the Plaintiffs, I conclude that the Plaintiffs have failed to show that they suffered a constitutional deprivation.  I would end our inquiry with that determination, and decline to reach the question of qualified immunity.

III.

Although I am unable to join the majority analysis, I concur in the result and would affirm the District Court's grant of summary judgment in favor of the State Troopers.